**Leland PATZNER, Appellant,**

v.

**Joyce BURKETT a/k/a Joyce McLaughlin, Deborah Myerchin and Stutsman County, North Dakota, a political subdivision, Appellees.**

No. 85–5094

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 9, 1985.
Decided Dec. 26, 1985.

James A. Wright, Jamestown, N.D., for appellant.

Barry P. Hogan, Moorhead, Minn., for appellees.

Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

LAY, Chief Judge.

Leland Patzner appeals from a summary judgment entered in favor of defendants Stutsman County, North Dakota, and Stutsman County sheriff deputies Joyce Burkett and Deborah Myerchin. Patzner brought this action under 42 U.S.C. § 1983, alleging that the two deputies had deprived him of his civil rights by arresting him in his home without a warrant and by using excessive force in making the arrest.[1] He premised Stutsman County's liability on its alleged failure to properly select, train or supervise its police personnel. The district court[2] granted summary judgment in favor of all defendants. Under a view of the facts in the light most favorable to Patzner, we affirm the summary judgment in favor of Stutsman County; we reverse and remand Patzner's claims against the two deputy sheriffs for a plenary trial.

Patzner, a 35 year old double amputee who lost both legs in the Vietnam War, was driving home in the early morning of April 17, 1983 when he struck another car driven by Pam Marsolek, his former sister-in-law. Patzner had been drinking beer that evening. He offered Marsolek money for the damage to her car, which she refused. He got back into his car, telling Marsolek that he would be at home if she decided to call the police. Patzner then

---

1. Patzner also alleged that the arrest was without probable cause and that he was subjected to cruel and unusual punishment during his detention in the Stutsman County jail. Summary judgment was also entered against him on these claims, but he does not appeal that portion of the district court's decision.

2. The Honorable Paul Benson, Chief Judge of the United States District Court for the District of North Dakota.

returned to his home, about two or three blocks from the accident scene.

Marsolek did contact the police and deputies Burkett and Myerchin were dispatched to investigate. Burkett was working as a deputy sheriff at the time, while Myerchin was a volunteer special deputy accompanying Burkett on a "ride-along" basis. When they arrived at the accident scene, Marsolek told them that Patzner had been drinking and had appeared intoxicated. The deputies then drove the short distance to Patzner's house.

Lester Naatus, who was staying with Patzner, was in Patzner's front yard when the officers arrived. Burkett approached Naatus and asked him if Patzner was home. Naatus told her he was and went to get Patzner. Burkett returned to the squad car, but after a time went up to the open front door and spoke to Naatus through the screen, asking him if she could speak with Patzner. Naatus replied that Patzner was in the kitchen. Burkett then entered the house, walked into the kitchen and told Patzner he was under arrest. Patzner replied that he was not going with her.

Burkett then pulled Patzner from his chair, which was approximately 12 to 18 inches high. At the time Patzner was not wearing his prosthetic legs. Burkett took hold of his left wrist and dragged him into the living room. Patzner admits that he was initially uncooperative, but states that he agreed to go with the deputy voluntarily after being pulled through the house. According to Patzner, Burkett ignored his agreement to cooperate, and never asked him where his wheelchair or prosthetic devices were.

Burkett then began handcuffing Patzner, when Myerchin entered the house to assist her. Myerchin helped Burkett finish handcuffing him, and the two deputies proceeded to drag and carry Patzner outside, down the front walk and into the squad car. When they arrived at the station house,

Patzner was again dragged and carried out of the car and up several stairs to the booking area, where he was placed on the floor. Myerchin apparently did not assist in bringing Patzner into the station house. Patzner refused to take a blood alcohol test, was booked for D.U.I. (driving under the influence of alcohol)[3] and held for detoxification. He was released approximately twelve hours later. Patzner asserts that he suffered extreme humiliation and pain by the deputies' treatment in hauling him from his home and up the jail house stairs.

Patzner was later charged with D.U.I. and prosecuted for the offense in Stutsman County Court. He moved to suppress all evidence gained by the entry into his home, and a dismissal of charges, on the ground that the arrest was illegal. The suppression court found that the arrest was unconstitutional and granted Patzner's motion to suppress. The court held that the state had failed to show the existence of exigent circumstances or consent. The state's attorney later dismissed the charges against Patzner.

Patzner then brought this § 1983 action for damages. Thereafter the district court, 603 F.Supp. 1139, granted summary judgment in favor of each defendant. The court concluded that the county could not be held liable for Patzner's injuries, and that the deputies were immune from liability for the claim based on the warrantless arrest. In addition, the court found that the deputies' use of force was not unreasonable as a matter of law and dismissed his claim for excessive force. This appeal followed.

**Liability of Stutsman County**

■ Patzner claims that the county's failure to properly select, train and supervise its deputies constituted an unconstitutional "custom" within the meaning of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and was the proximate cause of his

---

**3.** N.D.Cent.Code § 39–08–01 (Supp.1981). At the time of Patzner's arrest, North Dakota classified this offense as a misdemeanor with a mini-

mum penalty of either three days in jail or a fine of one hundred dollars. *Id.*

constitutional deprivation. *Monell* instructs that, for a municipality to be held liable under § 1983, a plaintiff must show that the action alleged to be unconstitutional implements a county policy or was invoked pursuant to a governmental custom, *Monell,* 436 U.S. at 690–91, 98 S.Ct. at 2035–36, and that the official policy was the "moving force" behind the violation. *Id.* at 694, 98 S.Ct. at 2037; *cf. Rizzo v. Goode,* 423 U.S. 362, 370–77, 96 S.Ct. 598, 603–07, 46 L.Ed.2d 561 (1976) (general allegation of administrative negligence fails to state a constitutional claim cognizable under § 1983). Moreover, the plaintiff must show not only that a policy or custom existed, and that it was causally related to the plaintiff's injury, but that the policy itself was unconstitutional. *See Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981); *Dick v. Watonwan County,* 738 F.2d 939, 943 (8th Cir.1984).

We addressed the scope of a municipality's § 1983 liability for failure to train or supervise its police officers in *Herrera v. Valentine,* 653 F.2d 1220 (8th Cir.1981). We held that a municipality may be liable if it had notice of prior misbehavior by its officers and failed to take remedial steps amounting to deliberate indifference to the offensive acts. "Deliberate indifference" may be shown by a failure to train, or by conducting a training program in a grossly negligent manner so that police misconduct inevitably occurs. *Herrera,* 653 F.2d at 1224. The plaintiff must also prove that the municipality's failure to act caused the plaintiff's injuries. *Id. See also Baker v. McCoy,* 739 F.2d 381 (8th Cir.1984); *Martin v. White,* 742 F.2d 469 (8th Cir.1984).

■ Patzner argues that the requisite notice of prior misconduct may be inferred from the fact that Deputy Burkett has made six arrests involving "physical confrontation" with citizens. We cannot

agree. Patzner failed to put forth any evidence suggesting that the arrest procedures Burkett employed on those occasions, or her use of physical means to effect them, were in any way improper. Misconduct cannot be presumed simply because a physical act occurred. The only incident described in any detail involved Burkett taking a loaded shotgun away from an intoxicated person.

Nor do we discern from the record as a whole any other facts suggesting prior notice of misconduct to the county. The night of Patzner's arrest was Special Deputy Myerchin's first night on the job. Clearly the county could not have had any prior awareness of a propensity to illegal conduct in her case. Further, absent a showing of prior misconduct, Burkett and Myerchin's behavior toward Patzner does not support an inference of notice to the county. The first isolated incident of misconduct by a subordinate employee generally is not enough to establish a policy or custom. In *Oklahoma City v. Tuttle,* —— U.S. ——, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), the plurality of the Court stated that:

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved.

*Id.* 105 S.Ct. at 2436. We therefore affirm the district court's grant of summary judgment in favor of Stutsman County.[4]

**The Unconstitutional Arrest**

■ We next address the issue of the deputies' liability for Patzner's warrantless home arrest.[5] Central to this question is

4. The district court, in concluding that the county was entitled to summary judgment, relied not only on the insufficiency of notice, but also held that Patzner had failed to show that the county's training and supervision of its deputies was grossly negligent, or that inadequate training

caused the misconduct alleged in this case. We do not reach those issues on this appeal, since the county's lack of sufficient notice alone precludes imposing liability.

5. The district court did not reach this issue, since it ruled the deputies immune from suit for

whether the arrest did violate Patzner's fourth amendment rights. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) held that absent probable cause and exigent circumstances, warrantless felony arrests in the home are prohibited by the fourth amendment. On appeal neither party disputes the existence of probable cause to effect the arrest; at issue is whether sufficient exigent circumstances existed to overcome the strong presumption that warrantless home arrests are *per se* unreasonable. *Payton,* 445 U.S. at 586, 100 S.Ct. at 1380; *see Coolidge v. New Hampshire,* 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042–43, 29 L.Ed.2d 564 (1971) ("a search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show * * * the presence of 'exigent circumstances' "); *McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948); *Johnson v. United States,* 333 U.S. 10, 14–15, 68 S.Ct. 367, 369–70, 92 L.Ed. 436 (1948). *See also United States v. Houle,* 603 F.2d 1297 (8th Cir.1979). The deputies contend that the threat Patzner posed to the public safety and the need to ascertain Patzner's blood alcohol level constituted sufficiently compelling reasons to dispense with the warrant requirement and arrest Patzner in his living room.

On the facts of this case, the claimed threat to public safety is unconvincing. There is no evidence suggesting that Patzner had any intention of getting back in his car and taking to the road. Indeed, the facts show a contrary intention. He had informed Marsolek at the accident scene that he was going home and would be there if she called the police. When the deputies arrived at Patzner's home, they apparently became impatient waiting because Patzner made no move to come to the door, much less leave the house. As Burkett entered the home, she observed Patzner preparing a plate of food for himself, suggesting that he was home for the night. At no time, then, was the threat that Patzner would

get behind the wheel again that evening anything more than speculation.

Nor did the need to preserve evidence of Patzner's blood alcohol level constitute an exigent circumstance sufficient to justify the arrest. The Supreme Court has recently held that "a warrantless home arrest cannot be upheld simply because evidence of the petitioner's blood alcohol level might have dissipated while the police obtained a warrant" when the underlying offense was classified as a noncriminal, civil forfeiture violation. *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 2100, 80 L.Ed.2d 732 (1984). The *Welsh* Court relied primarily on the deeply rooted principle that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Welsh,* 104 S.Ct. at 2097 (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)). Given the special protections guaranteed citizens to be free from government intrusions into their homes, the Supreme Court reasoned that when there is probable cause to believe that only a minor offense has been committed, "application of the exigent circumstances exception in the context of a home entry should rarely be sanctioned." *Welsh,* 104 S.Ct. at 2099. The severity of the offense is relevant to the equation insofar as it reflects the magnitude of the state's interest in precipitating an arrest for that offense. *Id.* at 2100.

This case is factually indistinguishable from *Welsh* except that, at the time the arrest was made, North Dakota classified this offense as a misdemeanor with a minimum sentence of a one hundred dollar fine or three days in jail. Under the *Welsh* analysis, this difference in penalty suggests a stronger state interest in effecting the arrest than the Wisconsin legislature expressed by punishing the same conduct with only civil sanctions. In our view, the minor difference in penalty is not sufficient

the arrest under the doctrine of qualified immunity. We discuss the immunity issue *infra.*

to support a result different from that reached in *Welsh.*[6]

Nor was this arrest justified by consent to enter the home. Generally, a valid and voluntary consent to enter may be followed by a warrantless home arrest. *United States v. Briley,* 726 F.2d 1301, 1303 (8th Cir.1984); *see United States v. Shigemura,* 682 F.2d 699, 705–06 (8th Cir. 1982) (consensual entry followed by seizure). However, consent cannot be presumed from the absence of proof that a person resisted police authority or proof that the person merely acquiesced. *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968); *see also Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In this case, the deputies apparently rely on Lester Naatus' agreement to go find Patzner and tell him the police were outside as a sufficient showing of consent for the officers to enter the house. However, no such inference of consent to enter could reasonably be drawn from Naatus' response. At most, his cooperation, such as it was, only extended to acting as a messenger for Burkett in response to her express requests. Although Naatus apparently acquiesced to her demands, there is no showing that he cooperated further by asking her in or otherwise acted on his own initiative. In sum, we conclude that the warrantless home arrest was neither justified by exigent circumstances nor validated by consent, and therefore violated Patzner's constitutional rights.[7]

### Qualified Immunity of Deputies

Patzner challenges the district court's conclusion that the deputies were shielded by qualified immunity from liability for making the warrantless arrest. The deputies may not be held liable for Patzner's injury if their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person should have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 815–19, 102 S.Ct. 2727, 2736–39, 73 L.Ed.2d 396 (1982). Under this stan-

---

6. This difference in penalty in fact has been narrowed following recent amendments to the North Dakota statute. While North Dakota still classifies first offense D.U.I. as a misdemeanor, an offender is subject to a higher fine ($250) but no jail time. N.D.Cent.Code § 39–08–01, subd. 5(a) (Interim Supp.1985).

7. We therefore need not rely solely on the alternative basis for decision on this issue that the deputies were precluded from relitigating this question under North Dakota principles of res judicata. A federal court may not disturb a prior state court determination of an issue in a subsequent § 1983 action if state collateral estoppel rules would prohibit relitigation of the issue in state court. *Allen v. McCurry,* 449 U.S. 90, 96–105, 101 S.Ct. 411, 415–21, 66 L.Ed.2d 308 (1980); *Migra v. Warren City School District,* 465 U.S. 75, 104 S.Ct. 892, 896–98, 79 L.Ed.2d 56 (1984). The state suppression judge rejected both the state's contentions that the arrest was justified by exigency or consent. In North Dakota, a matter is res judicata when the same issue "has been definitively and finally settled and determined on its merits by the decision of a court of competent jurisdiction," *Farmers State Bank v. Slaubaugh,* 366 N.W.2d 804, 806 (N.D.1985) and relitigation of that issue by a party or a person in privity with the party in a subsequent action is prohibited. *See Sturdevant v. SAE Warehouse, Inc.,* 270 N.W.2d 794, 798–99 (N.D.1978).

In this case, there is no question that the issue sought to be raised, the legality of the arrest, is identical to the issue decided by the suppression hearing court. Further, it appears that the issue was definitively and finally settled on its merits, since the state had the opportunity to appeal the suppression order, N.D.Cent.Code § 29–28–07, subd. 5 (Supp.1983); *see State v. Dilger,* 322 N.W.2d 461 (N.D.1982), and failed to do so. The time for appeal having expired, the matter may be considered conclusively decided. *See Larimore East View Development v. City of Larimore,* 275 N.W.2d 309, 314 (N.D.1979) (matter is res judicata when time for appeal has passed); *Stine v. Weiner,* 238 N.W.2d 918, 925 (N.D.1976) (same). Finally, the deputies in this case can be properly considered in privity with the state in the prior adjudication and thus bound by the state court's determination that the arrest was illegal. *See Medearis v. Miller,* 306 N.W.2d 200 (N.D.1981) (persons in privity with one another when one person's liability is derivative of the other's); *see also McCurry,* 449 U.S. at 102 n. 18, 101 S.Ct. at 419 n. 18 (state court decision that police acted legally forecloses a subsequent claim that they acted in bad faith). Therefore, although we conclude that the arrest was illegal in any event, application of state res judicata rules suggests that we would be bound by the suppression court's prior order holding the arrest illegal.

dard, the district court held the deputies immune from the warrantless arrest claim reasoning from dictum in *Welsh*. The *Welsh* Court observed that most courts have refused to permit warrantless home arrests for nonfelonious crimes but declined expressly to approve those decisions, or to consider whether the fourth amendment may impose an absolute ban on warrantless home arrests for certain minor offenses. *See Welsh*, 104 S.Ct. at 2099, 2097 n. 11. The district court therefore concluded that the illegality of the warrantless arrest was not clearly established, and that a reasonable person would not have known of the illegality of such an arrest.

■ We cannot agree with this reasoning. Certainly, *Harlow* counsels that when the legality of police conduct is an open question at the time the conduct occurs, the official must be held immune from suit. The same principle applies when the legal question at issue turns on the scope of the warrant requirement. *See Mitchell v. Forsyth*, —— U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Thus, "in cases where there is a legitimate question whether an exception to the warrant requirement exists, it cannot be said that a warrantless [arrest] violates clearly established law." *Mitchell*, 105 S.Ct. at 2820 n. 12. In *Mitchell*, however, the Supreme Court made clear that *Harlow* should not be construed to "suggest that an official is always immune from liability or suit for a warrantless [arrest] merely because the warrant requirement has never explicitly been held to apply to an [arrest] conducted in identical circumstances." *Id.* We cannot conclude, then, that these deputies are necessarily immune from suit simply because the Supreme Court had not yet squarely decided whether a warrantless home arrest of a citizen, made with probable cause that he or she has committed a misdemeanor traffic offense involving alcohol, is permissible under the fourth amendment. Rather, our task is to determine whether a *"legitimate question"* as to the legality of the arrest existed.

■ The defendants rely upon our decision in *Schlothauer v. Robinson*, 757 F.2d 196, 197–98 (8th Cir.1985), which held that at the time of a warrantless arrest in the home in 1979 there was still a legitimate question whether a home arrest, without a warrant and absent probable cause and exigent circumstances, was permissible. The *Schlothauer* panel recited the fact that *United States v. Houle*, 603 F.2d 1297 (8th Cir.1979), declaring such arrests illegal, had been decided only 11 days before the arrest, and further noted that the question had been expressly left open by the Supreme Court. The panel also observed that state law authorized such arrests. In fact, in 1980, 24 states, including North Dakota, permitted warrantless arrests even absent exigent circumstances and only three prohibited them on federal constitutional grounds alone. *Payton*, 445 U.S. at 598–599, 100 S.Ct. at 1386–1387. In that legal context, the *Schlothauer* court concluded that the rule announced in *Houle* and *Payton* had not been clearly established at the time the arrest in that case occurred.

Patzner's arrest, in contrast, occurred in a much different legal environment. When this arrest took place in April of 1983, *Houle* and *Payton* were firmly entrenched legal guideposts, and had removed any doubt that the privacy of the home is paramount in weighing fourth amendment concerns. It should have been obvious that if the home is to be protected against warrantless arrests for felonies, as *Payton* established, the home should be even more sacrosanct from invasion for warrantless arrests for minor crimes, requiring a far greater showing of exigency than that alleged here. The North Dakota legislature has apparently so concluded as well. The arrest in this case is no longer sanctioned by North Dakota law. The statute authorizing warrantless home arrests had been declared unconstitutional by the North Dakota Supreme Court in the wake of *Payton* two years earlier. *State v. Nagel*, 308 N.W.2d 539 (N.D.1981). An existing statute permits probable cause warrantless arrests for D.U.I., but does not expressly condone such arrests in the home. *See*

N.D.Cent.Code § 29–06–15, subd. 1(f) (Interim Supp.1985). We conclude that the illegality of Patzner's arrest was not seriously open to question at the time it occurred. We hold, therefore, that the deputies are not immune from suit with respect to Patzner's claims of illegal arrest.

██ It is also clear that Deputy Burkett's actions in making the illegal arrest may subject her to liability. She made the decision to make the arrest, unlawfully entered the home, seized and handcuffed Patzner, and participated in dragging him to the squad car. Nor is the scope of liability for the arrest any less with respect to Special Deputy Myerchin. That she was acting pursuant to Burkett's orders does not provide a basis for broader immunity in her case. *Putnam v. Gerloff*, 639 F.2d 415, 423 (8th Cir.1981) (claim for additional immunity may not be based solely on the fact that defendant was following instructions). Further, the record indicates that she actively participated in the illegal conduct by entering the home and assisting Burkett in handcuffing Patzner while still in his living room.

**Use of Excessive Force**

 We next turn to the question of the excessiveness of the force used in effecting this arrest. A plaintiff may recover for excessive use of force under § 1983 if the degree of force used was unreasonable under the circumstances, or if the force was used for an improper purpose. *Bauer v. Norris*, 713 F.2d 408, 411–12 (8th Cir.1983). The following factors are relevant to determining whether the use of force was reasonable and properly motivated:

> [A] court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Putnam*, 639 F.2d at 420 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.)), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). The district court concluded that the degree of force used in Patzner's arrest was reasonable as a matter of law, finding that the deputies did what they could under the circumstances, that the force applied was minor, and that Patzner had refused to cooperate. Patzner urges reversal of that determination, arguing that the degree of force used was in fact unreasonable as a matter of law.

██ The deputies and Patzner gave conflicting accounts of the circumstances surrounding this arrest. If we credit Patzner's account, which we must, we cannot conclude that the deputies' use of force was reasonable. Patzner admits he was initially uncooperative with Deputy Burkett, and refused to accompany her voluntarily to the squad car. However, according to Patzner, she never asked him where his wheelchair or prosthetic legs were before she pulled him off his chair to the floor and dragged him through his house. Burkett ignored Patzner's statement, made soon after she began dragging him, that he would cooperate. Although Deputy Burkett may have had probable cause to believe Patzner had committed a misdemeanor, this does not give her license to ignore, in fact exploit, Patzner's disability in effecting the arrest. We therefore reverse the summary judgment in favor of defendant Burkett on the excessive force claim. We also reverse the judgment in favor of Myerchin, since the record supports the inference that she too neglected to discover whether Patzner had a wheelchair or prostheses, and that she and Burkett, working together, dragged Patzner down the sidewalk to the squad car.

The extent of our holding, however, is limited to the recognition that the alleged use of excessive force is generally an issue of fact. The matter is presented to us on summary judgment, and at least at this time we need only hold that Patzner has established a question of fact to be resolved by the jury.

### Disqualification of Judge

Patzner last argues that the judgment should be reversed and the district court disqualified on remand, on the ground that one of the defense attorneys recently served as the district court judge's law clerk. Patzner contends that the court was subject to a claim of bias in favor of defense counsel, creating an appearance of impropriety contrary to the mandate of 28 U.S.C. § 455(a) (1982), requiring disqualification in any matter in which a judge's impartiality might reasonably be questioned. Patzner relies on the fact that the attorney was employed as the judge's law clerk until the summer of 1983, and assumed responsibility for this action shortly after May 5, 1984.

Patzner makes no claim that the district judge in fact exhibited bias towards his former law clerk. Absent such a showing, we need not deem the judge's participation in this case reversible error. *See United States v. Hollister*, 746 F.2d 420, 425 (8th Cir.1984). Nor do we go so far as to disqualify the judge from sitting in this case on remand. We leave that question to be resolved by the trial judge under the principles recommended in *Hollister*. In *Hollister*, we did suggest that any judge in the Eighth Circuit seriously consider recusal when an attorney who has recently served as a law clerk appears as counsel before him or her. *Id.* at 426. We declined to establish any "bright line" rule, however, mandating disqualification for a certain period of time after a clerk leaves a judge's employment, but left the matter to the judge's discretion.[8] In this case, defense counsel's clerkship ended approximately nine months before the complaint was filed, and over one year had passed before his name was listed as counsel on any document before the court. In these circumstances, we cannot conclude that it was an abuse of discretion for the trial judge to decline to disqualify himself.

---

**8.** In light of *Hollister* the Eighth Circuit Court of Appeals has promulgated a rule providing that a circuit court law clerk may not "after leaving employment participate in any way as an attorney in any case pending in this Court during his

Judgment affirmed as to the grant of summary judgment in favor of county; judgment reversed and remanded with directions to grant plaintiff a plenary trial against the two deputy sheriffs. Each party is to bear his or her own costs for this appeal.

or her term of service, or appear at counsel table or on brief in any case heard during a period of one year following separation from service with the Court." 8th Cir.R. 30.