Elmer J. LAPPE, Appellant,

v.

Paul LOEFFELHOLZ, Dr. Wiedershine and Harlem Brady, Appellees.

No. 85–1989.

United States Court of Appeals,
Eighth Circuit.

Submitted May 14, 1986.

Decided April 1, 1987.

Rehearing and Rehearing En Banc Denied June 25, 1987.

Heaney, Circuit Judge, dissented and filed opinion.

Martin C. Dolan, Student Legal Intern, Iowa City, Iowa, for appellant.

John M. Parmeter, Asst. Atty. Gen., Des Moines, Iowa, for appellees.

Before HEANEY, JOHN R. GIBSON and MAGILL, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Elmer J. Lappe appeals from a judgment denying his 42 U.S.C. § 1983 (1982) claim against Dr. Paul Loeffelholz and other officials of the Iowa State Prison system for forcibly injecting him with psychotropic medication. Lappe is an Iowa State Penitentiary inmate who was involuntarily committed to a mental health institute and was later allowed to return to the general penitentiary population on the condition that he continue his medication. The district court,[1] in approving the report of the magistrate, determined that the law concerning the forced administration of medication to an inmate on outpatient status, who is nonetheless still in custody at the penitentiary, did not clearly establish that the actions violated Lappe's constitutional rights. The court concluded that, under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), the officials are protected from suit by qualified immunity. Lappe argues that Loeffelholz and the other officials must be charged with knowledge of Lappe's federal due process rights and with knowledge of the state-created rights based on Iowa statutes and Iowa Supreme Court rules, all of which would have required a hearing on the issue of Lappe's continued need for medication. He further argues that the court's denial of counsel prevented him from fully litigating his claim in the district court. We affirm the judgment of the district court.

Lappe was an inmate at the Iowa State Penitentiary. In November 1982 he was transferred to another cell house because he had been disruptive. The penitentiary officials believed that Lappe's mental condition was deteriorating, and he was re-

---

1. The Honorable W.C. Stuart, United States Dis-    trict Judge for the Southern District of Iowa.

ferred to Dr. Loffelholz, Director of the Iowa Security Medical Facility and a medical consultant for the Iowa Department of Corrections, for psychiatric evaluation. He recommended that Lappe be transferred to the Iowa Security Medical Facility pursuant to Iowa Code Ann. § 246.16 (West 1985) and Lappe was so transferred on January 10, 1983. He became resistive, and an application was filed for involuntary hospitalization pursuant to Iowa Code Ann. § 229.6. A full hearing was held pursuant to Iowa Code Ann. § 229.12, after which he was committed to the care of the Mental Health Institute in Mt. Pleasant, Iowa. He was transferred back to the Iowa Security Medical Facility on February 14, 1983. In a February 24 discharge summary, Dr. Loeffelholz recommended that Lappe be discharged from the Iowa Security Medical Facility, returned to the custody of the penitentiary on an "outpatient involuntary commitment status," and that his medication be continued. Dr. Loeffelholz prescribed Stelazine and Cogentin for oral ingestion and, if Lappe refused, he was to be injected with five milligrams of Haldol. Lappe was then transferred back to the penitentiary and Dr. Loeffelholz submitted to the district court a periodic report pursuant to section 229.15(4) in which he stated that "[o]utpatient commitment is * * * important for this individual as he responds quite positively to medication, but when left to his own devices, he terminates use of these medications." On the basis of this report and recommendation, the court issued an order transferring Lappe to the penitentiary and continuing his medication on an outpatient basis. On March 17, 1983, he was readmitted to the Iowa Security Medical Facility because he had refused to take medication. During that visit Dr. Loeffelholz spoke with Lappe and he agreed to take the medication. He was then returned to the Iowa State Penitentiary.

A period of time followed in which Lappe refused medication. On August 30, 1983, after Lappe's specific refusal to take the oral medication, an altercation took place with the Correctional Emergency Response Team. Mace was used on Lappe, and the CERT team restrained him so that a nurse could administer the intramuscular Haldol injection. During the altercation, Lappe stabbed one of the officers in the knee and groin with a pencil and Lappe was struck on his shin. Photographs showed that Lappe sustained cuts on his face, chest, back, shoulder, and left shin.

Lappe then brought this action, raising the forced medication issue as well as other issues not raised on this appeal. The magistrate found that Lappe was given no notice, hearing, or other opportunity to establish good cause for refusing the medication prior to its forced administration. He concluded that under federal and state law Lappe should have been provided with those minimum procedural protections so that he could show why treatment was not necessary.

Both the magistrate and the district court concluded, however, that the right to these procedural protections in the case of an inmate with outpatient status was not clearly established at the time of the forced medication. Thus, under the standards set forth in *Harlow* and *Davis,* the defendants were entitled to qualified immunity from suit. We agree, and we also conclude that there was no unconstitutional denial of counsel.

**I.**

**A.**

In a section 1983 action for damages against a public official the court "appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred." *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738. Even if Lappe has a due process right to a hearing, the officials are protected by qualified immunity if, under the law as it existed at the time of the forced medication, there was a "legitimate question" as to the existence of that right. *See Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 2820 n. 12, 86 L.Ed.2d 411 (1985).

The rationale for the "clearly established" requirement is that public officials

are constantly required to exercise discretion in carrying out their official duties. It would be unfair to these officials, and a deterrent to their exercise of independent judgment, to expect them to anticipate subsequent legal developments on pain of exposure to monetary liability. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Wood v. Strickland,* 420 U.S. 308, 319–20, 95 S.Ct. 992, 999, 1000, 43 L.Ed.2d 214 (1975).

Lappe argues that *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), clearly established that the fourteenth amendment entitled him to another hearing before he could be subjected to forced behavior modification. Keeping in mind that we are deciding the issue of the officials' qualified immunity, and that our focus is on the question of whether Lappe's rights were *clearly established,* we reject Lappe's argument. Once Lappe was given a full hearing on the issues of his involuntary commitment and need for medication, it is not clear that the forced administration of Haldol deprived him of the protections established in *Vitek.*

In *Vitek,* a prisoner was declared by a designated physician to be mentally ill and was transferred from the prison to a mental hospital. The Nebraska statute authorizing such a transfer did not provide the prisoner with notice or an opportunity for a hearing. The Supreme Court held that even though "the restrictions on the prisoner's freedom of action at the [mental hospital] by themselves might not constitute the deprivation of a liberty interest retained by a prisoner, * * * the stigmatizing consequences of a transfer to a mental hospital coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that requires procedural protections." *Id.* at 494, 100 S.Ct. at 1264. The Court affirmed the district court's determination that when a transfer to a mental hospital is being considered, due process requires the state to provide written notice to the prisoner, an adversary hearing by an independent decisionmaker, and legal counsel to any inmate financially unable to furnish his own. *Id.* at 494–95, 100 S.Ct. at 1264–65.

All of these procedural protections were granted to Lappe. He had a full hearing on the issue of his involuntary commitment to the Iowa Security Medical Facility.[2] After the hearing, the judge issued his findings and ordered Lappe committed to full-time custody, care, and treatment at the Medical Facility. There is no question but that once these procedures were complied with, and while Lappe was an inpatient at the Medical Facility, Dr. Loeffelholz, as

---

2. Lappe's hearing was held pursuant to Iowa Code Ann. § 229.12, which provides in part:

1. At the hospitalization hearing, evidence in support of the contentions made in the application shall be presented by the county attorney. During the hearing the applicant and the respondent shall be afforded an opportunity to testify and to present and cross-examine witnesses, and the court may receive the testimony of any other interested person. The respondent has the right to be present at the hearing. If the respondent exercises that right and has been medicated within twelve hours, or such longer period of time as the court may designate, prior to the beginning of the hearing or an adjourned session thereof, the judge shall be informed of that fact and of the probable effects of the medication upon convening of the hearing.

2. All persons not necessary for the conduct of the proceeding shall be excluded, except that the court may admit persons having a legitimate interest in the proceeding. Upon motion of the county attorney, the judge may exclude the respondent from the hearing during the testimony of any particular witness if the judge determines that that witness' testimony is likely to cause the respondent severe emotional trauma.

3. The respondent's welfare shall be paramount and the hearing shall be conducted in as informal manner as may be consistent with orderly procedure, but consistent therewith the issue shall be tried as a civil matter. Such discovery as is permitted under the Iowa rules of civil procedure shall be available to the respondent. The court shall receive all relevant and material evidence which may be offered and need not be bound by the rules of evidence. There shall be a presumption in favor of the respondent, and the burden of evidence in support of the contentions made in the application shall be upon the applicant. If upon completion of the hearing the court finds that the contention that the respondent is seriously mentally impaired has not been sustained by clear and convincing evidence, it shall deny the application and terminate the proceeding.

Medical Director of the Facility, could prescribe intramuscular injections of psychotropic medication despite Lappe's wishes.

At the time of the forced medication, however, Lappe was not at the hospital; he had been transferred back to the penitentiary. The magistrate found that Dr. Loeffelholz intended that Lappe's release to the penitentiary be conditioned on his continued medication. In his February 24, 1983 discharge summary, and his March 1, 1983 periodic report, Dr. Loeffelholz explained the reasons for the transfer. He stated that Lappe was no longer dangerous to others, and since he refused to participate in treatment programs at the hospital, there was no need for full custody. He qualified that opinion, however, by stating that "outpatient involuntary commitment status" at the penitentiary was the least restrictive course of treatment because "[Lappe] responds to medicine but when left to his own devices terminates their use." Thus, he recommended that if Lappe refused oral medication he should be injected with Haldol.

Lappe argues that once the court returned him to outpatient status by transferring him back to the penitentiary, he regained a liberty interest in his outpatient status. He asserts that under *Vitek*, this liberty interest could not be taken away, *i.e.*, he could not be forcibly treated at the penitentiary, without another hearing to determine whether or not he had good cause for refusing the medication.

In deciding whether a constitutional right was clearly established, we must determine the "requisite degree of factual correspondence" needed between previous cases and the case before us. *See Hicks v. Feeney*, 770 F.2d 375, 379 (3d Cir.1985). In *Hicks*, the court made a distinction between a strict standard, requiring near factual identity between the cases, and a more flexible standard, requiring only some factual correspondence and demanding that officials apply well-developed legal principles in carrying out their duties. *Id.* at

379–80. We believe that the flexible approach strikes a better balance between protecting the official from unexpected liability and promoting the public interest in deterring unlawful conduct. This standard "prevents the occurrence of a mere 'factual wrinkle' in an area of clearly established law from barring suit altogether." *Id.* at 380 (quoting *People of Three Mile Island v. Nuclear Regulatory Comm'rs*, 747 F.2d 139, 148 (3d Cir.1984)). Even using this flexible approach, however, we conclude that the legal principles enunciated in *Vitek* did not clearly establish that Lappe, after his transfer back to the penitentiary, was entitled to another due process hearing before he could be forcibly injected with the prescribed medication.

The court's order conditioned Lappe's release on his continued medication. It granted Lappe only a limited liberty interest, not full outpatient status. Thus, the officials here were required to determine the answer to a question not presented in *Vitek*, namely, whether an inmate who has already had one due process hearing and whose release was conditioned on continued medication has a right to another due process hearing whenever he refuses treatment. Lappe's liberty interest in not being classified and treated as a mentally ill individual was extinguished when he had his first hearing according to the procedures established in *Vitek*. Whether that liberty interest was reestablished by the court's conditional release poses a legitimate question under the law. Regardless of how we might answer that question now, at the time of the incident the officials could not have referred to any well established legal principles to determine that Lappe had a federal due process right to another hearing.

Lappe relies on *Bee v. Greaves*, 744 F.2d 1387 (10th Cir.1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985), to support his assertion that his right to refuse treatment was clearly established at the time of the August 1983 incident.[3] We

---

3. Lappe recognizes that, since *Bee* was decided in 1984, that decision itself is not part of the body of clearly established law in August, 1980. He merely argues that *Bee* is persuasive because the *Bee* court based its decision on its interpretation of constitutional law as it stood in 1980.

think *Bee* is distinguishable. Unlike the plaintiff Bee, a pre-trial detainee, Lappe was granted a full adversarial hearing on the need for his commitment to full custody, care, and treatment at the State Mental Facility, and on his continuing need for medication. His subsequent conditional release to the custody of the penitentiary officials was after this full *Vitek*-type hearing. We do not believe that the court in *Bee* determined that *Vitek* clearly established that a prisoner who has had a full hearing cannot be forcibly medicated without having another full hearing on the issue.

## B.

Lappe also argues that he had a state-created right not to be forcibly medicated and that this right was clearly established before the August 30, 1983 incident. He bases his argument on the provisions of Chapter 229 of the Iowa Code and on Rule 32 of the Iowa Supreme Court Rules for Involuntary Hospitalization for the Mentally Ill. He argues that he was not in custody as provided for in Chapter 229, but was on outpatient status at the penitentiary. He claims that, as an outpatient, Rule 32 and the provisions of Chapter 229 gave him the right to refuse treatment until he had another due process hearing and the court ordered him recommitted to full custody at the mental facility.

Chapter 229 does not specifically refer to the procedure to be followed for the involuntary hospitalization, treatment, and release of prison inmates. Thus, the threshold question is whether Chapter 229 mandates that an inmate receive full outpatient status when he is transferred from a mental facility back to a prison on conditional release, or whether he can be considered to remain in custody.

Section 229.23 of the Iowa Code provides that every person who is hospitalized or detained under Chapter 229 has the right to refuse treatment by chemotherapy. The only exceptions to this right noted in section 229.23 are instances in which the court has ordered that the patient be taken into custody pursuant to section 229.13 or 229.-14. In any other situation where the chief medical officer feels that chemotherapy is appropriate, but the patient refuses to consent, the officer must request a court order authorizing the treatment.

Custody under section 229.13 addresses the situation in which, upon completion of a hospitalization hearing, the court finds that the contention that the person is seriously mentally impaired has been sustained by clear and convincing evidence. In such an instance, the court orders the person "placed in a hospital or other suitable facility as expeditiously as possible for a complete psychiatric evaluation and appropriate treatment." In Lappe's case, the court issued an order pursuant to this section on January 17, 1983.

Section 229.14 concerns the chief medical officer's report to the court on the psychiatric evaluation of the committed patient. Under this section, the chief medical officer may report the status of the patient as fitting within one of four alternatives: subsection (1) provides for the patient's immediate release; subsection (2) provides for continued full-time custody in a hospital setting; subsection (3) provides for treatment on an outpatient basis; and subsection (4) provides for a transfer to an alternative placement for a patient who is "seriously mentally impaired and in need of full-time custody and care, but is unlikely to benefit from further treatment in a hospital." [4]

■ In the present case, Lappe was first classified under section 229.14(2) as being in need of full-time custody, care, and treatment at the Medical Facility. In the March 1, 1983 report, however, Lappe was reclassified under section 229.14(3) as mentally ill but not in need of full-time hospitalization. He was put on outpatient status,

---

**4.** At first blush, section 229.14(4) seems to fit Lappe's situation. However, a complete reading of section 229.15(3) and 227.2(4) indicates that the alternative placement contemplated is one in a county care facility, not a transfer of an inmate back to custody in a pententiary. We note this additional obstacle in interpreting Chapter 229 only to further emphasize the difficulty of defining "custody" in an inmate/outpatient context.

more fully described in the February 24 discharge summary as "outpatient involuntary commitment status." Dr. Loeffelholz also indicated that Lappe was to be transferred to the penitentiary pursuant to section 229.15(4). Section 229.15(4) provides for convalescent or limited leave or for a transfer to a different hospital for full-time custody, care, and treatment. It contains no mention of the status, outpatient or otherwise, of the individual being transferred, or whether convalescent or limited leave is meant to encompass an inmate's return to the penitentiary. Dr. Loeffelholz informed the hospitalization referee that Lappe's condition improved while at the medical facility primarily because of the medication he had been given. Dr. Loeffelholz also made the court aware that the least restrictive, effective treatment for Lappe required continued medication while at the penitentiary because "when left to his own devices, [Lappe] terminates use of these medications." In his February 28 discharge summary, Dr. Loeffelholz prescribed oral medication, and stated that if that was refused, Lappe should be given an intramuscular injection of Haldol. The discharge summary states that Lappe was made aware of these terms. The court then ordered Lappe's transfer, conditioned on continued medical treatment as prescribed by Dr. Loeffelholz. Dr. Loeffelholz' obvious intention in transferring and recategorizing Lappe was to give him an intermediate status: to keep him in custody under the terms of section 229.14(3) for the purpose of keeping him on medication, yet allow him to return to the general prison population because of his unwillingness to participate in other hospital treatment programs. However, our reading of section 229.14(3) and the other provisions in Chapter 229 indicates that there is nothing which permits such an intermediate status. It appears that an individual who is not in full-time custody, care, and treatment at a hospital cannot be forcibly medicated. Thus, Lappe could not be treated on a limited outpatient basis as Dr. Loeffelholz had intended and as the court had apparently contemplated as a condition of the transfer. Instead, Lappe's transfer back to the penitentiary changed his status; as an inmate he was in full custody, but as a mentally impaired individual, he was an "outpatient" under section 229.14(3).

Having determined that Lappe was an outpatient at the time of the forced medication, we could engage in a detailed analysis of the Iowa statutes and the Iowa Supreme Court rule to determine whether he was denied due process rights when he was forcibly medicated without notice and a hearing before an impartial decision maker. Again, the question before us, however, is not the substantive determination of the meaning of these statutes and rules, but rather the question of whether the law was clearly established.[5]

█ Using the *Harlow* standard, we hold that the status of an inmate/inpatient, who is then conditionally released to the custody of penitentiary officials, was not clearly established under Iowa law; thus, the defendants are entitled to immunity. The right to refuse treatment exists only when the patient is not in custody. Our discussion above illustrates the difficulty of categorizing a patient whose "release" is in reality a transfer to custody in a penitentiary. The lack of any prior interpretation of

---

**5.** The specific procedures to be followed when an outpatient refuses to submit to treatment are outlined in section 229.14(3) and 229.15(2), and in Rule 32 of the Iowa Supreme Court Rules for Involuntary Hospitalization for the Mentally Ill. Rule 32, for example, states that if the chief medical officer determines under section 229.14(3) that the patient is seriously mentally impaired and in need of treatment, but does not require full-time hospitalization then "the chief medical officer * * * shall determine the specific care and treatment guidelines upon which the outpatient status will be based * * *. If the chief medical officer * * * alleges that the O.T.P. [Outpatient Treatment Plan] has been breached, the judge or judicial hospitalization referee shall hold a hearing as provided by Sections 229.14(3) and 229.12, The Code, to determine whether the patient should be rehospitalized, whether the O.T.P. should be revised, or whether some other remedy should be ordered * * *." Under the terms of these provisions, it appears that Lappe should have been provided an opportunity to show good cause for refusing treatment before being forcibly medicated. If he did not establish good cause, then the court should have issued an order returning him to full inpatient status at the Medical Facility.

these recently amended provisions [6] along with the difficulty of interpreting their application to a patient in Lappe's position created a legitimate question for the prison officials who attempted to exercise their discretion. This was sufficient to confer qualified immunity upon the defendants. *See Mitchell v. Forsyth*, 105 S.Ct. at 2820 n. 12.

Lappe also argues that the defendants knew that Chapter 229 applied and that they must have known of the right to refuse treatment because of the intensity of professional dialogue on the subject. We first note that these arguments on their face are not persuasive. Even if the defendants knew that Chapter 229 applied, this says nothing as to whether they knew how it applied to an inmate in these circumstances.[7] And the intensity of professional dialogue on the right to refuse treatment has no bearing on the state of the law. More importantly, however, determining the accuracy of these assertions would engage this court in the very state-of-mind analysis that the Supreme Court rejected in *Harlow*. 457 U.S. at 815–17, 102 S.Ct. at 2736–37. Since we have determined that the defendant's conduct was objectively reasonable, we need not proceed through such an elaborate subjective inquiry.

## II.

We have examined Lappe's assertion that he could not fully litigate his claim because he was denied counsel and find it to be without merit.

In *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Supreme Court reaffirmed that an inmate has a right of access to the courts in challenging the conditions of his confinement. The Court went on to hold that protection of this right requires that inmates be provided with adequate law libraries or adequate assistance from persons trained in the law. *Id.* at 828, 97 S.Ct. at 1498. Prison legal assistance clinics were noted as one of the acceptable means of assuring such meaningful assistance. *Id.* at 830–31, 97 S.Ct. at 1499.

Here, after an evidentiary hearing before a magistrate and the submission of posttrial briefs, the Prison Assistance Clinic of the University of Iowa Law School was granted leave to file an amicus curiae brief in support of Lappe. The Clinic presented oral argument at a December 1984 hearing before the magistrate. Then, on February 28, 1985, Lappe filed a motion for appointment of counsel in which he claimed a lack of legal assistance. The record demonstrates that Lappe has received adequate assistance throughout this litigation including the present appeal, and his access to the courts has in no way been impeded.

Accordingly, the judgment of the district court is affirmed.

---

6. Lappe's argument that *C.R. v. Adams*, 649 F.2d 625 (8th Cir.1981), and the legislature's subsequent revision of Chapter 229 clearly established Lappe's due process rights cannot stand. In *C.R. v. Adams*, this court abstained from deciding C.R.'s claim that Chapter 229 unconstitutionally revoked his outpatient status without notice or hearing. In response, the legislature amended the statute to conform to federal constitutional requirements, and to clarify that notice and hearing are required. *C.R. v. Adams* and the legislative revision show only that a hearing is necessary to revoke outpatient status. They do not address the crucial threshhold question of whether Lappe, as an inmate, had such outpatient status to begin with.

7. The dissent reasons that, because Dr. Loeffelholz was aware of the applicable state law and the possible constitutional claims concerning Lappe's medication, he therefore knew he was violating Lappe's constitutional rights. *See post*

at 1181. A defendant who knows the appropriate legal standard, however, does not necessarily know how to apply that standard when faced with a unique situation. For example, in *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), cited by the dissent, *post* at 1181, the court held that a police officer's request for a warrant must be objectively reasonable for qualified immunity to apply. We do not take this to mean that any officer who knows that "probable cause" is the correct legal standard can be automatically charged with knowing whether it exists in a particular case; instead, the question is whether the defendant, knowing the law, was objectively reasonable in applying it. While there is evidence in the record that Dr. Loeffelholz knew the provisions of state law and regulations and knew of Lappe's objection, there is no evidence that Dr. Loeffelholz knew he was violating Lappe's rights.

HEANEY, Circuit Judge.

I respectfully dissent. In my view, the majority opinion is wide of the mark in two respects. First, it fails to properly analyze how the *Harlow* standard applies to an official who actually *knew* he was violating the law. Second, it erroneously concludes that the law prohibiting the forced administration of medication to an inmate on outpatient status without a due process hearing was not clearly established.

*Harlow v. Fitzgerald* did *not* establish a rule absolving public officials from their constitutional violations whenever the law was unclear; rather, it stated that they "*generally* are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738 (emphasis added). Justice Brennan, in his concurring opinion joined by Justice Marshall and Justice Blackmun, explained the exceptions to the general rule of immunity in the event of unclear law:

> I agree with the substantive standard announced by the Court today, imposing liability when a public-official defendant "knew or should have known" of the constitutionally violative effect of his actions. * * * This standard would not allow the official who *actually knows* that he was violating the law to escape liability for his actions, even if he could not "reasonably have been expected" to know what he actually did know. * * * Thus the clever and unusually well-informed violator of constitutional rights will not evade just punishment for his crimes.

*Harlow*, 457 U.S. at 820–821, 102 S.Ct. at 2739–2740 (emphasis in original, citations omitted).

The fact that Justice Brennan correctly stated the *Harlow* holding is underscored in *Malley v. Briggs*, 475 U.S. 335, ——, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271, 278 (1986), where Justice White, writing for seven Justices, stated: "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or *those who knowingly violate the law.*" (Emphasis added.)

In his concurring-dissenting opinion in *Malley*, Justice Powell, the author of *Harlow*, joined by Justice Rehnquist, illuminated his earlier opinion:

> In *Harlow*, * * * the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* 457 U.S. at 818, 102 S.Ct. at 2738. Putting it differently, we also stated that a claim for qualified immunity "would be defeated [only] if an official '*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" *Id.* at 815, 102 S.Ct. at 2737, quoting *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975).

*Malley*, 475 U.S. at ——, 106 S.Ct. at 1100, 89 L.Ed.2d at 283 (emphasis in original).

Accordingly, it is clear that a public official cannot claim qualified immunity if he or she actually knew that he or she was violating another person's constitutional rights. Because the record in this case reveals that Dr. Loeffelholz knew state law required that Lappe be afforded a hearing before he could be medicated against his will, he is not entitled to qualified immunity.

On August 8, 1983, Lappe filed suit in federal district court alleging that his due process rights had been violated by the forced administration of an unidentified drug. The district court found that Lappe's complaint stated a colorable claim and, on the same day, ordered the defendants served. It also ordered the defendants to explain the nature of the drug, its effects, and whether Lappe was being forced to take it. Additionally, the court ordered officials at the Iowa State Penitentiary and the Iowa Security Medical Facility to review the allegations and consider

the possibility of institutional action to resolve Lappe's problems.

Notwithstanding the fact that Dr. Loeffelholz was fully aware of the provisions of the state law and regulations, that he had been served with the August 8, 1983, complaint and the district court's order, and thus was on notice that Lappe's objections to medication stated a colorable constitutional claim, he directed that medication be administered to Lappe on August 30, with or without Lappe's consent. Dr. Loeffelholz did so even though no emergency existed. He knew he was violating Lappe's rights; thus, he is not entitled to qualified immunity.

Even if we assumed that Dr. Loeffelholz did not have actual knowledge of the fact that he was violating Lappe's rights, he should have known that he was because both the federal and state law prohibiting the forced administration of drugs to Lappe was clearly established before August 30, 1983.

Federal due process prohibits a state from transferring a prisoner to a mental health facility without procedural protections. *Vitek v. Jones*, 445 U.S. 480, 494–97, 100 S.Ct. 1254, 1264–66, 63 L.Ed.2d 552 (1980). The behavior modification resulting from the transfer in *Vitek* constituted a "grievous loss" of liberty subject to due process protections. *Id.* at 488, 100 S.Ct. at 1261. Similarly, forced injection of behavior modifying drugs resulted in a loss to Lappe of liberty protected by federal due process.

Notwithstanding Lappe's right to be free from forced medication, the majority holds that the right was not clearly established in 1983, because *Vitek* did not address the specific situation of an inmate-outpatient. Although it is true that *Vitek* did not address that situation, the majority's conclusion misstates the appropriate standard for determining whether the law was clearly established. In the context of the fourth amendment, the Supreme Court has recently stated that an official is not "always immune from liability or suit for a warrantless search merely because the warrant requirement has never explicitly been held

to apply to a search conducted in identical circumstances." *Mitchell v. Forsyth*, 472 U.S. 511 n. 12, 105 S.Ct. 2806 n. 12, 86 L.Ed.2d 411, n. 12 (1985). Rather, an official is immune if a "legitimate question" exists as to the legality of the action. *Id.; see also Patzner v. Burkett*, 779 F.2d 1363, 1370 (8th Cir.1985).

Accordingly, the absence of a case finding due process protections in a situation involving an inmate-outpatient refusing medication is not determinative of the immunity issue. The appropriate inquiry is whether a "legitimate question" existed in 1983 as to the legality of forced medication. Considering that due process protections were found to attach in situations involving a pretrial detainee and an involuntarily committed patient, it is difficult to perceive how inmate-outpatient status is different enough to create a "legitimate question" of law.

*Vitek* itself involved a prison setting, and accorded due process protections to the transfer prior to medication. The loss of liberty specifically addressed in *Vitek* was the transfer to the hospital. Due process attached, however, because forced behavior modification would necessarily follow. 445 U.S. at 488, 100 S.Ct. at 1261. If anything, *Vitek* assumes the right of input regarding medication and simply accords protection to the attendant circumstances.

Perhaps the most persuasive indication that Lappe had a clearly established federal right is the *Vitek* Court's observation that:

[w]ere an ordinary citizen to be subjected involuntarily to these consequences, it is undeniable that protected liberty interests would be unconstitutionally infringed absent compliance with the procedures required by the Due Process Clause. We conclude that a convicted felon also is entitled to the benefit of procedures appropriate in the circumstances before he is found to have a mental disease and transferred to a mental hospital.

*Id.* at 492–93, 100 S.Ct. at 1263. *Vitek* thus made clear in 1980 that a person's status as a prisoner does not extinguish the

due process protections attendant to treatment for mental disease.

Similarly in the present case, an ordinary citizen on outpatient status could not be forcibly injected with drugs without due process. Lappe's status as an inmate did not extinguish this right. In light of *Vitek's* clear language and its consistent application in the Circuits, it does not appear that a legitimate question existed in 1983 as to the legality of the forced injection. Accordingly, Dr. Loeffelholz violated Lappe's clearly established federal constitutional rights and is not entitled to immunity.

The majority's position that the procedures required by state law were not clearly established in 1983 is even more difficult to accept. Iowa statutes *specifically* required notice and a hearing before an outpatient could be involuntarily treated. Iowa Code Ann. §§ 229.11, 229.12, 229.14(3) (1985). These provisions did not except inmates from their coverage and, under *Vitek*, it is doubtful whether Iowa could do so consistent with the federal constitution.

Lappe was involuntarily committed after a hearing pursuant to Iowa Code Ann. Chapter 229. The chief medical officer then evaluated Lappe, *id.* § 229.13, and found that he was "seriously mentally impaired and in need of treatment, but [did] not require full-time hospitalization." *Id.* § 229.14(3). The court classified Lappe as an outpatient and he was sent back to the Iowa State Penitentiary. When Lappe "refuse[d] to submit to treatment as directed by the court's order," *id.*, the statute allowed the *court* to take appropriate action. In this situation, the court could have ordered immediate detention and return to full-time custody after notice and hearing. *Id.* The defendants admit that this procedure was not followed, but argue that its applicability to Lappe's situation was not "clearly established." [1]

The Iowa scheme, however, contains only one exception to the judicial intervention requirement. Section 229.23(2) gives a "hospitalized or detained" person the right to refuse treatment by shock therapy or chemotherapy unless an emergency exists or the person is in "custody authorized by the court pursuant to sections 229.13 or 229.14." Section 229.14(3), the provision under which Lappe was released to the Iowa State Penitentiary, allows the court to order a return to custody after notice and a hearing. Lappe's status at the time of the forced injection was that of outpatient under section 229.14(3). He was not in custody as contemplated by chapter 229 because the custody provisions of section 229.14(3) had not been triggered.

Accordingly, the terms of the statute constitute clearly established guidelines and the state law prohibiting the forced administration of medication to Lappe under the circumstances of this case was clearly established at the time of the violation.

---

1. Lappe asserts that the defendants in fact knew of these procedures and their applicability to him because they had complied with the statutes when he had previously refused to take his medication. The state does not dispute the truth of this assertion, but argues that such evidence is irrelevant to the immunity issue.