**Terry L. ARCOREN, Plaintiff,**

v.

**Wenton PETERS and John Schooler, Defendants.**

**Civ. No. 83–3017.**

United States District Court,
D. South Dakota, C.D.

Feb. 13, 1986.

---

**1514**

Yvette Hall War Bonnett, Dakota Plains Legal Services, Mission, S.D., for plaintiff.

Robert Mandel, Asst. U.S. Atty., Pierre, S.D., for defendants.

## MEMORANDUM OPINION

DONALD J. PORTER, Chief Judge.

This is an action for an alleged violation of plaintiff's Fifth Amendment right to due process brought directly under the United States Constitution. See *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Named as defendants are John Schooler, District Director for the FmHA, and Wenton Peters, a supervisor for the FmHA.[1] Plaintiff seeks damages for the allegedly unlawful repossession and sale of his cattle, pursuant to a security agreement with the FmHA, without prior notice and an opportunity to be heard.

1. All of the original defendants except Schooler and Peters, sued as individuals, were dismissed from the case on August 6, 1984.

2. FmHA regulations define default, in part, as "[w]hen a borrower ... [c]eases to conduct farming or other operations for which the loan was made [or] has not cared properly for [the

## JURISDICTION

Jurisdiction is predicated upon 28 U.S.C. § 1331 and 5 U.S.C. § 702.

## FACTS

Plaintiff Arcoren received approximately $19,000 in FmHA loans during a period beginning in 1978. Arcoren used part of the loan proceeds to purchase cattle, which were subject to a FmHA security agreement. In late March, 1980, a local FmHA office was notified by third parties that Arcoren had abandoned his cattle.[2] Without notifying plaintiff, Peters, after consulting with Schooler, repossessed plaintiff's cattle and sold them.

Arcoren did not learn of the repossession and sale until April 1, 1980, when he received a bill of sale from the Winner Livestock Auction Company. FmHA applied the sum realized from the sale of plaintiff's cattle, $9,068.34, to his FmHA account. Subsequently, plaintiff received a notice of acceleration from FmHA.

## PROCEDURAL HISTORY

Upon learning of FmHA's actions and his right to appeal, Arcoren pursued an administrative appeal through three of four possible levels. Unsuccessful in his agency appeals, Arcoren filed this *Bivens*-styled action in district court.

This court initially dismissed the case for failure to state a claim. *Arcoren v. Schooler*, Civ. 83–3017, (D.S.D. Nov. 2, 1984). This court held that the post-seizure appeals process was adequate to protect Arcoren's due process rights. *Id.* at 4. In addition, this court found that the availability of a "comprehensive administrative appeal process", *id.* at 5, was a "special factor[ ] counselling hesitation before authorizing a new kind of federal litigation."

security].…" 7 CFR § 1962.4(g)(2) & (3) (1980).

Plaintiff claims he had not abandoned his cattle. Whether he was actually in default, however, is immaterial. Plaintiff seeks relief for deprivation of his property *without prior notice and a hearing*. It is undisputed that no such notice and hearing were provided.

*Id.*, quoting *Bush v. Lucas*, 462 U.S. 367, 377, 103 S.Ct. 2404, 2411, 76 L.Ed.2d 648 (1983) (citations omitted).

The Eighth Circuit Court of Appeals reversed the dismissal, holding that "the FmHA administrative appeals process set forth in 7 CFR § 1900.53 (1980), under the unique circumstances of this case, does not defeat an action brought directly under the fifth amendment to the United States constitution." *Arcoren v. Farmers Home Administration*, 770 F.2d 137, 141 (8th Cir. 1985). The case was remanded for further proceedings, and now is before this court for decision of the defendant's motion for summary judgment on the issue of absolute and qualified immunity of the individual defendants.

## DISCUSSION

**Absolute Immunity.**

Defendants first assert absolute immunity under *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Although the court doubts the applicability of *Imbler* to this case, see *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), it is not necessary to decide that question, because the court's holding on the issue of qualified immunity will be dispositive.

**Qualified Immunity.**

Prior to 1982, the leading case on qualified immunity was *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). *Wood* created a two-part test to determine the availability of qualified immunity. Qualified immunity was not an available defense if the government official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [person] affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the [person]." *Wood*, 420 U.S. at 322, 95 S.Ct. at 1001.

The purpose of qualified immunity is to allow the orderly processes of government to continue, while still protecting, to the fullest extent possible, the constitutional rights of individual citizens. With a qualified immunity defense available, "public [officials] understand that action taken in the good-faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances will not be punished and that they need not exercise their discretion with undue timidity." *Id.* at 321, 95 S.Ct. at 1000.

Recognizing that the *Wood* test was not serving its intended purpose of disposing of "insubstantial lawsuits" on motion for summary judgment, the Court revised the *Wood* test by eliminating the subjective element. *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982) (citations omitted). Applying the new test, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. Even if the right violated is shown to have been "clearly established" at the time of the official's alleged wrongdoing, if he "claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained." *Id.* at 819, 102 S.Ct. at 2738. The qualified immunity defense applies equally to *Bivens*-styled constitutional tort actions and cases brought pursuant to 42 U.S.C. § 1983. *Butz*, 438 U.S. at 500–01, 98 S.Ct. at 2907–08.

**Clearly Established Rights.**

The Court has never plainly defined the term "clearly established." See *Wood*, 420 U.S. at 329, 95 S.Ct. at 1004 (Powell, J., concurring in part and dissenting in part). As the Court of Appeals for the District of Columbia Circuit has observed:

Our task, in applying *Harlow*, is to measure the constitutionality of the acts alleged in this action by reference to clearly established rights at the time the acts occurred. At first blush, the task as so stated appears simple and straightforward. A moment of reflection, however,

reveals various uncertainties in the *Harlow* decision and exposes a test of some imprecision. It is not clear, for example, how a court should determine well-established rights: Should our reference point be the opinions of the Supreme Court, the Courts of Appeals, District Courts, the state courts, or all of the foregoing? Furthermore, it is unclear whether we must assure ourselves only of the existence of a constitutional right such as the constitutional right of freedom of speech, or religion, at the relevant time. Alternatively, it might be claimed that a court must inquire more deeply into the constitutionality of the particular conduct of the Government actor, such as the legality of domestic national security warrantless wiretaps, at a given time. Put another way, how broadly or narrowly defined is the right that must be well-established?

At the extremes, the answers are clear. Supreme Court precedent "establishes" the law; to the extent that the Court's opinions give guidance we obviously do not doubt that the law is well-established. It is equally clear that the right at issue can be defined neither so broadly as to parrot the language in the Bill of Rights, nor so narrowly as to require that there be no distinguishing facts between the instant case and existing precedent. The former reading of *Harlow* would, of course, undermine the premise of qualified immunity that the Government actors reasonably should know that their conduct is problematic. The latter reading, on the other hand, would unquestionably turn qualified into absolute immunity by requiring immunity in any new fact situation.

*Hobson v. Wilson,* 737 F.2d 1, 25–26 (D.C. Cir.1984) *cert. denied,* —— U.S. ——, 105 S.Ct. 1843, 85 L.Ed.2d 142 (footnotes omitted) (emphasis in original).

It is true, of course, that to require *"no distinguishing facts between the instant case and existing precedent"* would under-

mine the rationale behind the qualified immunity defense. The question remains, however, to what extent the official involved must extend existing precedent to determine its potential applicability to his situation. Fortunately, the Supreme Court has given some guidance in this regard. Generally speaking, officials are not required to "anticipate subsequent legal developments, nor could [they] fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

In *Mitchell v. Forsyth,* —— U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court narrowed even further the government official's responsibility to predict the future course of the law. Plaintiff in *Forsyth* was an anti-war protestor who sued former Attorney General John Mitchell for alleged violations of the plaintiff's Fourth Amendment rights by authorizing a warrantless wiretap for reasons of national security. *Id.* —— U.S. at ——, 105 S.Ct. at 2808–09, 86 L.Ed.2d at 416–17. The district court rejected Mitchell's claim of qualified immunity. Even though warrantless wiretaps for national security purposes were not unlawful at the time of Mitchell's actions, the district court felt that the Supreme Court decision in *Keith,*[3] forbidding such wiretaps, was "merely a logical extension of general Fourth Amendment principles and in particular of the ruling in *Katz,*[4] ...." in which the Court first outlawed warrantless wire taps in general. *Forsyth,* —— U.S. at ——, 105 S.Ct. at 2811, 86 L.Ed.2d at 419 (citations omitted).

The Supreme Court reversed the district court, finding that

whatever the agreement with the Court's decision and reasoning in *Keith* may be, to say that the principle *Keith* affirmed had already been "clearly established" is to give that phrase a meaning that it cannot easily bear. The legality of the warrantless domestic security wiretap Mitchell authorized in November 1970,

---

3. *United States v. United States District Court (Keith),* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). *Keith* was decided after Mitchell's allegedly unlawful conduct.

4. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

was, at that time, an open question, and *Harlow* teaches that officials performing discretionary functions are not subject to suit when such questions are resolved against them only after they have acted. The District Court's conclusion that Mitchell is not immune because he gambled and lost on the resolution of this open question departs from the principles of *Harlow*. Such hindsight-based reasoning on immunity issues is precisely what *Harlow* rejected.

*Id.* —— U.S. ——, 105 S.Ct. at 2820, 86 L.Ed.2d at 431 (footnotes omitted).

With these principles in mind, the court now turns to the question of whether plaintiff had a "clearly established" right to pre-seizure notice and a hearing.

**Right to Pre-Seizure Notice and a Hearing.**

Plaintiff argues that, at the time FmHA repossessed his cattle in 1980, there existed a "clearly established statutory or constitutional right" to notice and a hearing prior to any FmHA action such as that involved here. Defendants, however, claim that they relied on the self-help provisions of the U.C.C.,[5] which have generally been upheld as lawful. *See Bichel Optical Laboratories, Inc. v. Marquette National Bank*, 487 F.2d 906 (8th Cir.1973); Brodsky, Constitutionality of Self-Help Repossession Under the Uniform Commercial Code: The Eighth and Ninth Circuits Speak, 19 S.D.L. Rev. 295 (1973).[6] While it is true that *Bichel* dealt with a commercial lender, and not an agency of the federal government,

defendants argue that they were not on notice in 1980 that FmHA would be treated differently than a private lender. Since commercial self-help, which FmHA believed it was entitled to utilize, had not been declared unlawful, defendants argue that their actions in March of 1980 violated no "clearly established" rights of the plaintiff.

▮ Plaintiff contends that the availability of due process is a cornerstone upon which this country was built. "The Plaintiff urges that the complete lack of notice and no opportunity to respond to the evidence against him violated the established, settled law in 1980 that when a protected property interest is involved[,] prior to deprivation the individual must be afforded some rudiments of due process..."[7] Response to Defendants' Motion for Summary Judgment at 6 (filed July 13, 1984). In order for a constitutional guarantee applicable to a particular situation to be clearly established, however, it is "clear that the right at issue can[not] be defined ... so broadly as to parrot the language in the Bill of Rights...." *Hobson*, 737 F.2d at 26. Such a reading of *Harlow* "would, of course, undermine the premise of qualified immunity that the Government actors reasonably should know that *their* conduct is problematic." *Id.* (emphasis in original). Thus, this broad claim cannot "clearly establish" the rights plaintiff asserts.

▮ Arcoren next argues that the Supreme Court's decision in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), clearly established his right to

---

**5.** The relevant provisions of the U.C.C. are found at S.D.C.L. §§ 57A–9–503, 57A–9–504(3). SDCL § 57A–9–503 provides, in pertinent part, that "[u]nless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action." SDCL § 57A–9–504(3) provides, in pertinent part, that "[u]nless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale ..." must be given.

**6.** Although the self-help provisions of the U.C.C. have been declared unconstitutional in at least

two cases, *Watson v. Branch County Bank*, 380 F.Supp. 945 (W.D.Mich.1974), *rev'd without opin.* 516 F.2d 902 (6th Cir.1975); *Boland v. Essex County Bank & Trust Co.*, 361 F.Supp. 917 (D.Mass.1973), those were "exceptional cases. A greater number of decisions have held that repossession under the provisions of the U.C.C. does not entail state action." Cook & Sobieski, 2 *Civil Rights Actions* ¶ 7.27[B] at 7–151. (1985) (footnote omitted). See *infra* note 10.

**7.** *See Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971).

pre-seizure notice and a hearing. In *Goldberg*, the Court held that only *pre-termination* notice and a hearing afforded a welfare recipient procedural due process, because "termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits." *Id.* at 264, 90 S.Ct. at 1018 (emphasis in original). Arcoren claims that FmHA loan programs are predominantly a form of social welfare legislation, see *Coleman v. Block,* 562 F.Supp. 1353 (D.N.D.1983) (preliminary injunction), 580 F.Supp. 194 (1984) (permanent injunction); *Curry v. Block,* 541 F.Supp. 506 (S.D.Ga.1982) *aff'd.* 738 F.2d 1556 (11th Cir.1984), and thus the FmHA is subject to the holding in *Goldberg.* Although plaintiff argues that the *Coleman* and *Curry* decisions were no "revelation" to the FmHA, the fact remains that prior to those decisions, FmHA had reasonably relied on its status as a quasi-commercial lender in order to take advantage of the self-help provisions of the U.C.C. Even if the requirement of pre-seizure notice and a hearing is a "logical extension" of *Goldberg,* the FmHA was entitled to "gamble", *Forsyth,* —— U.S. at ——, 105 S.Ct. at 2820, 86 L.Ed.2d at 431, that as far as its farm lending practices were concerned, it would be treated as a commercial lender, rather than a *Goldberg*-type welfare agency. Assuming [8] that the FmHA may have subsequently "lost" its gamble, *Coleman,* 580 F.Supp. 194, *Curry,* 541 F.Supp. 506, that does not deprive it of qualified immunity.[9] *Forsyth,* —— U.S. at

——, 105 S.Ct. at 2820–21, 86 L.Ed.2d at 431.

■ Plaintiff also contends that *Fuentes v. Shevin,* 407 U.S. 67 (1972) and *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) clearly establish his right to pre-seizure process. In *Fuentes,* the Court struck down Florida and Pennsylvania replevin statutes as lacking due process, because they provided for no pre-seizure notice to the debtor and the creditor was not required to make any factual showing in support of his contention that he was entitled to possession. 407 U.S. at 82–83, 93, 92 S.Ct. at 1995, 2000. The *Sniadach* decision similarly outlawed garnishment statutes which provide no prior notice to the garnishee. *Sniadach,* 395 U.S. at 340–42, 89 S.Ct. at 1822–23.

Neither *Fuentes* nor *Sniadach* outlawed self-help such as is provided for in U.C.C. § 9–503. There is some doubt that, if given the opportunity, the Court would extend *Fuentes* and *Sniadach* to statutory self-help provisions.[10] Further, even if a ruling such as plaintiff urges were the next "logical step" in the progression of due process law, defendants were once again entitled to proceed on the assumption that such an extension would not take place.[11] *Forsyth, supra; see Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974).

■ Finally, plaintiff contends that defendants violated his "clearly established" statutory rights under SDCL § 57A–9–504(3) [12] and 7 CFR § 1962.42(c)(5).[13] It is

---

**8.** The court need not and does not decide what due process, if any, the FmHA must afford its borrowers in the circumstances presented by this case.

**9.** Even if it were clearly established in 1980 that FmHA programs were social welfare legislation, it is *not* clear that *Goldberg* would be extended to the FmHA. See *Mathews,* 424 U.S. 319, 96 S.Ct. 893.

**10.** *See United States v. Whiting Pools, Inc.,* 462 U.S. 198, 206 n. 14, 103 S.Ct. 2309, 2314 n. 14, 76 L.Ed.2d 515 (1983); *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 618 n. 13, 94 S.Ct. 1895, 1905, n. 13, 40 L.Ed.2d 406 (1974); *Fuentes,* 407 U.S. at 103, 92 S.Ct. at 2005 (White, J., dissenting); *Brodsky,* 19 S.D.L.Rev. at 301–02.

**11.** The foregoing discussion is not intended as any indication of the role which state action may or may not play in federal Constitutional tort analysis. Rather, its purpose is to demonstrate that, no matter what analytical approach is taken, there was no clearly established right to notice and a hearing prior to the FmHA's repossession of Arcoren's cattle in March, 1980.

**12.** See supra note 5.

**13.** 7 CFR § 1962.42(c)(5)(i) provides, in pertinent part, that "[n]otice of public or private sale of repossessed property *when required* will be given to the borrower...." (Emphasis added). Notice is not required if the sale involves collateral of "a type customarily sold on a recognized market...." 7 CFR § 1962.42(c)(5)(i)(A) (1980).

"clearly established", plaintiff argues, that cattle are not collateral of a type "customarily sold on a recognized market." Arcoren cites *United States v. Mid-State Sales,* 336 F.Supp. 1099 (D.Neb.1971); *State Bank of Towner v. Hansen,* 302 N.W.2d 760 (1982) and *Wippert v. Blackfeet Tribe,* 695 P.2d 461 (Mont.1985), in support of his argument. None of the cases cited, however, "clearly establishes", as of March, 1980, that cattle are not collateral of a "type customarily sold on a recognized market." *Mid-State Sales Co.* held that cattle were not "perishable" within the meaning of U.C.C. § 9–504(3), but said nothing about the issue presented here. 336 F.Supp. at 1103. *Hansen* and *Wippert,* although they both held that cattle are not collateral of a "type customarily sold on a recognized market", were decided after March, 1980. In addition, two state court cases, from states other than South Dakota, can hardly be said to "clearly establish" the law applicable here. Defendants therefore violated no "clearly established" statutory rights of the plaintiff.

## CONCLUSION

Although the law was apparently headed in the direction of requiring notice and a hearing prior to FmHA repossession of collateral, it cannot be said that the law was "clearly established" on that point in March, 1980. Similarly, it is not clear that the defendants violated the U.C.C. or their own regulations, as they stood in 1980. Having violated no clearly established statutory or constitutional rights of plaintiff, the individual defendants must be dismissed on the basis of qualified immunity.