**Terry L. ARCOREN, Appellant,**

v.

**Wenton PETERS and John Schooler, Appellees.**

No. 86–5119.

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1987.

Decided Sept. 25, 1987.

B.J. Jones, Mission, S.D., for appellant.

James M. Spears, Dept. of Justice, Washington, D.C., for appellees.

Before LAY, Chief Judge, HEANEY, ROSS,[*] McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN and MAGILL, Circuit Judges, En Banc.

JOHN R. GIBSON, Circuit Judge.

Two Farmers Home Administration (FmHA) officials repossessed and sold Terry Arcoren's cattle, in which FmHA held a security interest, without giving him prior notice or an opportunity to be heard. Arcoren brought a *Bivens*-style action against the two FmHA officials under the fifth amendment, alleging a due process violation. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The central issue in this case is whether it was clearly established in 1980 that the FmHA officials could not, consistent with the fifth amendment, use the self-help remedy permitted under South Dakota's Uniform Commercial Code, S.D. Codified Laws Ann. § 57A–9–503 (1980), in repossessing Arcoren's cattle when they believed he was in default on his FmHA loan. The district court[1] held that Arcoren's constitutional right to notice and a hearing before the cattle were repossessed and sold was not clearly established and therefore dismissed the action against the government officials on the basis of qualified immunity. A panel of this court reversed the district court's dismissal, *Arcoren v. Peters*, 811 F.2d 392 (1987), and we granted a rehearing en banc. We now vacate the panel's decision and affirm the judgment of the district court.

Arcoren received two FmHA loans, one in 1976 and one in 1978, totaling $18,800. He used part of the proceeds to purchase cattle, and he signed a security agreement giving FmHA a security interest in the livestock. In the winter months, Arcoren's cattle were located on either the trust land belonging to his father and his uncle, John Arcoren, Sr., or on land belonging to Richard Hand, his neighbor. In March 1980, Hand and Arcoren's uncle visited the office of Wenton Peters—a County Supervisor for FmHA who had previously been in contact with the plaintiff on other matters concerning his loan—and complained to Peters that they were providing all of the care for Arcoren's cattle and had been doing so for some months. They told Peters that they would turn Arcoren's cattle out onto the road if FmHA did not take some action. About a week later they visited Peters' office again, and told him that they had placed the cattle in a corral for FmHA to repossess. That day, Peters contacted his supervisor, John Schooler, an FmHA District Director, and Schooler agreed that FmHA should repossess and sell Arcoren's

---

[*] The Honorable Donald R. Ross, an active Judge of this court at the time this case was submitted, took senior status on June 13, 1987.

1. The Honorable Donald J. Porter, Chief Judge, United States District Court for the District of South Dakota.

cattle.[2] They did not make any attempt to verify with Arcoren the allegations made by Hand and John Arcoren, Sr. They repossessed Arcoren's cattle on March 27, 1980, and the cattle were·sold on March 28. Arcoren first learned of the repossession and sale of the cattle on April 1, when he received from the Winner Livestock Auction Company a copy of a bill of sale for twenty head of cattle.

Arcoren then brought this *Bivens* action and the district court dismissed for failure to state a claim, concluding that the availability of the FmHA appeals process supplanted any constitutionally based remedy. On appeal, we held that the administrative appeals process does not defeat an action brought directly under the fifth amendment. *Arcoren v. Farmers Home Admin.*, 770 F.2d 137 (8th Cir.1985). We reversed and remanded for further consideration of whether Arcoren could establish a *Bivens* action. *Id.* at 141. On remand, the district court concluded that the claims were barred by qualified immunity and dismissed the action. *Arcoren v. Peters*, 627 F.Supp. 1513 (D.S.D.1986). The only issue before us on this appeal is the propriety of the ruling on qualified immunity.

## I.

Qualified immunity accommodates competing social interests by ensuring that "plainly incompetent" officials or officials who "knowingly violate the law" are held accountable, while officials who reasonably exercise their discretion may do so without fear of being sued. *See Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *Harlow v. Fitzgerald*, 457 U.S. 800, 813–14, 102 S.Ct. 2727, 2735–36, 73 L.Ed. 396 (1982). When performing a discretionary function, a government official is entitled to qualified immunity from suit if, at the time of his conduct, it was not

"clearly established" that his actions would violate the plaintiff's constitutional or statutory rights. *Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738–39. As the district court aptly noted, determining what constitutes clearly established law is no simple task. *See Arcoren*, 627 F.Supp. at 1515–16.

The qualified immunity defense fails when the official acts in a manner that disregards undisputed constitutional guarantees. *See Wood v. Strickland*, 420 U.S. 308, 321–22, 95 S.Ct. 992, 1000–01, 43 L.Ed.2d 214 (1975). For this reason, we have held that public officials must "apply well-developed legal principles in carrying out their duties." *Lappe v. Loeffelholz*, 815 F.2d 1173, 1177 (8th Cir.1987). An official is not expected to anticipate the law's development or its possible application to a unique situation. *See Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738; *Wood*, 420 U.S. at 319–20, 95 S.Ct. at 999–1000; *Lappe*, 815 F.2d at 1176. Such a requirement would " 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.' " *Harlow* at 814, 102 S.Ct. at 2736 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950)). Moreover, the official could not have "known" that his conduct would violate the law unless that conduct had been identified as unlawful. *Id.* Thus, an official does not forfeit his immunity because he "gambled and lost on the resolution of [an] open question." *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2820, 86 L.Ed.2d 411 (1985).

## II.

Whether Arcoren had a clearly established constitutional right to prior notice and a hearing turns in large part on whether *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct.

2. Under FmHA regulations, a borrower is in default when he has "not cared properly" for the security. 7 C.F.R. § 1962.4(g)(3) (1980). Also, under the terms of the security agreement, Arcoren was in default if he failed to "observe or perform any covenants or agreements [in the security agreement]," one of which was to "care for and maintain the collateral in a good and husbandlike manner * * * [and] not abandon the collateral * * *." Designated Record at 17–18. The agreement provides that, upon default, the secured party "at its option, with or without notice as permitted by law, may * * * enter upon the premises and take possession of [the collateral and] exercise any sale or other rights accorded by law." D.R. at 18.

1983, 32 L.Ed.2d 556 (1972), is directly applicable to the facts before us. In *Fuentes*, the Court held the prejudgment replevin provisions of Florida and Pennsylvania statutes invalid under the fourteenth amendment because they permitted a deprivation of property without an opportunity for a pre-seizure hearing. The challenged statutes allowed any person who claimed that his goods were being wrongfully detained to obtain a writ of replevin from a court clerk simply by filing a complaint and a security bond. The issuance of the writ allowed the creditor to invoke state power to effect a prejudgment seizure. The writ directed the state officer to seize the property, and allowed him to use force when necessary.[3] Concluding that due process requires "an opportunity for a hearing *before* the State authorizes its agents to seize property in the possession of a person upon the application of another," *id.* at 80, 92 S.Ct. at 1994, the Court held the Florida and Pennsylvania replevin statutes unconstitutional. *Id.* at 96, 92 S.Ct. at 2002.

■ Immediately after *Fuentes*, the constitutionality of self-help repossession under U.C.C. § 9–503—as used here by the FmHA—came into question. *See, e.g.,* Brodsky, *Constitutionality of Self-Help Repossession Under the Uniform Commercial Code: The Eighth and Ninth Circuits Speak*, 19 S.D.L.Rev. 295 (1973). Since then, however, the courts have almost uniformly upheld statutes allowing a creditor to proceed by self-help.[4] In *Bichel Optical Laboratories, Inc. v. Marquette National Bank of Minneapolis*, 487 F.2d 906 (8th Cir.1973), this court distinguished the state action involved in the *Fuentes* replevin procedure from the U.C.C.'s self-help remedy, which "involve[s] only private actions arising out of the express written agreements between the parties." *Id.* at 907; *see also Adams v. Southern Cal. First Nat'l Bank*, 492 F.2d 324 (9th Cir.

1973), *cert. denied,* 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974). Thus, if a private creditor had financed Arcoren's loan, the creditor would have been entitled under S.D. Codified Laws Ann. § 57A–9–503, to take possession of the property without notice or a hearing in the event of default, and Arcoren would have no claim that his constitutional rights were violated.[5] Arcoren asserts, however, that because the FmHA is a governmental agency, it could not rely on the self-help provisions of the U.C.C. He argues that the FmHA had additional responsibilities under the fifth amendment and could not operate in the same manner as a commercial lender. We reject this argument. We do not believe that the cases clearly establish this proposition even as of today, much less as of 1980.

■ In 1980, when the repossession occurred, there was strong authority to support the FmHA officials' position that when the FmHA acted as a lender, it acted in a commercial rather than a sovereign capacity. In *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), a case involving the relative priorities of private liens and government liens stemming from federal lending programs, the Court held that government security interests are controlled by the commercial law of each state. The Court stated that the FmHA does not require the special priority of a sovereign power as it does, for example, in the case of a tax lien because the "[g]overnment * * * is in substantially the same position as private lenders." *Id.* at 737, 99 S.Ct. at 1463. It endorsed the court of appeals' view that the FmHA acted as a "quasi-commercial lender," *id.*, and noted that:

> [t]he agencies evaluate the risks associated with each loan, examine the interests of other creditors, choose the security

---

3. The Florida replevin statute provided that if the goods were inside some enclosure and were not delivered upon demand, the officer "shall cause such house, building or enclosure to be broken open * * *." Fla.Stat.Ann. § 78.10 (Supp.1972–73).

4. *See* Burke, *More Decisions on the Constitutionality of Self-Help Repossessions,* 27 Pers.Fin.L.Q. Rep. 115, 116 (1973) (collecting cases).

5. We recognize that if the secured creditor is wrong in his determination of default, the debtor may have a tort claim, but that is not the issue before us.

believed necessary to assure repayment, and set the terms of every agreement. By carefully selecting loan recipients and tailoring each transaction with state law in mind, the agencies are fully capable of establishing terms that will secure repayment.

*Id.* at 736, 99 S.Ct. at 1462–63 (footnotes omitted).

This is not to say that when the government engages in a traditionally private function there is no federal government action and fifth amendment due process restrictions do not apply. The Supreme Court, however, has consistently recognized that the process that is "due" depends on the precise nature of the government function involved and the private interest that has been affected. *See Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976); *Cafeteria & Restaurant Workers, Local 473 v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230 (1961). Unlike the situation in *Fuentes,* the FmHA was not operating pursuant to its authority as a sovereign power, but pursuant to a security agreement that permitted the FmHA to repossess and sell the cattle "with or without notice as permitted by law" if Arcoren was in default. D.R. at 18.

Similar circumstances have been examined in the context of non-judicial mortgage foreclosures by the Government National Mortgage Association (GNMA) and the Federal National Mortgage Association (FNMA). *See Warren v. Government Nat'l Mortgage Assoc.,* 611 F.2d 1229 (8th Cir.), *cert. denied,* 449 U.S. 847, 101 S.Ct. 133, 66 L.Ed.2d 57 (1980); *Roberts v. Cameron-Brown Co.,* 556 F.2d 356 (5th Cir. 1977); *Northrip v. Federal Nat'l Mortgage Assoc.,* 527 F.2d 23 (6th Cir.1975). In these cases, the courts rejected similar fifth amendment due process claims. Although the holdings were based on the ground that there was no federal government action, there were strong indications that the courts relied heavily upon the fact that FNMA and GNMA foreclosures were initiated pursuant to a contractual agreement between the parties.

In *Warren,* the plaintiff asserted that GNMA's failure to afford her notice and a hearing prior to the foreclosure sale violated her fifth amendment due process rights. This court recognized that GNMA "is not only wholly-owned by the federal government, but it also operates under federal government authority." 611 F.2d at 1233. Despite this seemingly indisputable entanglement with the federal government, we concluded that "mortgage foreclosures through power of sale agreements * * * are not in and of themselves powers of a governmental nature." *Id.* at 1234. The court also quoted approvingly from the district court:

A wholly-owned government agency can enforce a valid *contractual* provision for foreclosure without running afoul of the constraints of the Fifth Amendment, under all circumstances in which the foreclosure of the same contract by a private lender would be held not to violate the requirements of due process.

*Id.* (quoting *Warren v. GNMA,* Civil Action No. 19006–2, slip op. at 6 (W.D.Mo. Feb. 12, 1979)).

In *Northrip,* the Sixth Circuit also concluded that no federal government action exists when FNMA forecloses on a mortgage because foreclosure through a power of sale agreement is a contractual remedy, and FNMA is not exercising powers traditionally associated with sovereignty. 527 F.2d at 32. The court noted that the foreclosure is analogous to self-help repossession under U.C.C. section 9–503, which is an "age-old creditor remedy." *Id.* at 33. The court stated that it was no more significant that FNMA foreclosed the mortgage than it would have been if a private creditor had done so. *Id.* Moreover, even though the court did not reach the issue of what process would be due if there were federal government action, it did note that there would be little reason to require a pre-foreclosure hearing because as a practical matter a mortgagee would have no reason to institute foreclosure proceedings unless the mortgagor had defaulted. *Id.*

The panel opinion looked to section 122 of the Agricultural Credit Act of 1978, 7

U.S.C. § 1981a (1982), as clearly establishing that Arcoren had a constitutional right to notice and a hearing. It viewed *Allison v. Block*, 723 F.2d 631 (8th Cir.1983), as, not an innovation, but a logical interpretation of the Act based on its language and legislative history. We believe that section 1981a and *Allison* do not apply to the circumstances of this case.

Section 1981a permits the Secretary of Agriculture to defer the principal and interest on outstanding FmHA loans and to forego foreclosure if the borrower shows that, due to circumstances beyond his control, he is unable to make the required payments without unduly impairing his standard of living. In *Allison*, this court interpreted section 1981a as imposing a duty on the Secretary to give notice to borrowers of the availability of this relief and establish uniform procedures that allow borrowers to demonstrate their eligibility for deferral. The court based its decision entirely on statutory grounds, and "declined to meet the constitutional issues" raised by the Allisons. 723 F.2d at 633 n. 1. In conclusion, the court stated that "Congress * * * clearly expressed its intent to assist farmers blown astray by [the changing winds of time, nature, fate, and the economy] by granting those who could show that their inability to meet their financial obligations was temporary more time to repay their debts to the government." *Allison*, 723 F.2d at 638.

Despite the fact that the decision in *Allison* was based on a specific statutory right to notice of the availability of section 1981a relief, the panel in *Arcoren* held that the Agricultural Credit Act clearly established a "constitutional right of protection for farmers' property by facilitating whenever practicable the continued operation of existing agricultural enterprises." 811 F.2d at 399. We do not read the Act so broadly. Moreover, FmHA officials could not be on notice in 1980 that section 1981a, which protects farmers with financial difficulties in bad times, would be extended by a court to encompass default in a case such as this

where financial difficulty was not an issue. We do not believe that *Allison* —decided in 1983—makes this extension, and it certainly does not indicate that Arcoren had a clearly established constitutional right in 1980.[6]

■ We need not determine whether Arcoren's fifth amendment rights were actually violated. In deciding a question of qualified immunity, as we have discussed earlier, we look to whether established law informed the defendants that their conduct violated "basic, unquestioned constitutional rights." *See Wood*, 420 U.S. at 322, 95 S.Ct. at 1001. Arcoren has not demonstrated, nor has our study caused us to conclude, that there is a constitutional right to prior notice and a hearing when the government acts in the capacity of a commercial lender pursuant to a security agreement. Actually, based on cases such as *Warren* and *Northrip, supra*, it would be easier for us to hold that in 1980 the law was clearly established that the FmHA officials could act as they did. We need not go that far, however; in a qualified immunity case we need only determine that there was a "legitimate question" as to what process was due Arcoren in these circumstances. *See Mitchell*, 105 S.Ct. at 2820 n. 12. Thus, we conclude that the defendants did not violate clearly established law in using the secured creditor's self-help remedy under S.D. Codified Laws Ann. § 57A–9–503.

### III.

■ Arcoren further asserts that the defendants violated the clear provisions of the security agreement, FmHA regulations and South Dakota's U.C.C. A *Bivens* action for damages, however, must be founded upon a violation of constitutional rights. *Bivens*, 403 U.S. at 396, 91 S.Ct. at 2004–05; *McIntosh v. Weinberger*, 810 F.2d 1411, 1432–33 (8th Cir.1987). A violation of a statute or a regulation does not rise to a constitutional level unless the statutory or

---

**6.** At oral argument, Arcoren's counsel stated that Arcoren was current in his payments and that section 1981a did not apply.

regulatory provisions supply the basis for the claim of a constitutional right. *Davis v. Scherer*, 468 U.S. 183, 193–94 & n. 12, 104 S.Ct. 3012, 3019 n. 12, 82 L.Ed.2d 139 (1984); *Culbreath v. Block*, 799 F.2d 1248, 1250 (8th Cir.1986). State law, for example, creates the property and liberty interests that are protected by the fifth amendment, and thus may bear upon a plaintiff's claim that he was deprived of such property or liberty without due process. *See Davis*, 468 U.S. at 193 n. 11, 104 S.Ct. at 3018 n. 11; *McIntosh*, 810 F.2d at 1432. Here, however, the question concerns not whether Arcoren has an established property interest, but what process is due him before repossession and sale of that property by the FmHA acting as a secured creditor. Arcoren does not argue that our analysis of what process is due turns on the South Dakota statutes or the FmHA regulations. Instead, he asserts that we need not reach the due process issue because the FmHA officials acted beyond their authority as established in the regulations, statute, and security agreement. Appellant's Brief at 11. However, "[w]here neither the constitutional right nor the constitutional cause of action is expressly created by the terms of a regulation or statute, officials do not forfeit qualified immunity solely by failing to comply with the provisions of that statute or regulation." *Culbreath*, 799 F.2d at 1250 (citations omitted).

▇ Even if we were to assume, however, that the procedures outlined in the statutes, regulations, and security agreement bore upon the question of what process was due, there is no provision that clearly establishes the right to notice and a hearing *before* FmHA officials could determine that Arcoren was in default. S.D.

Codified Laws Ann. § 57A–9–503 states in part:

> Unless otherwise agreed, a secured party has on default the right to take possession of the collateral. In taking possession, a secured party may proceed without judicial process if this can be done without breach of the peace * * *.

Also, under S.D. Codified Laws Ann. § 57A–9–504, a secured party after default may sell the secured property without notice to the debtor if certain conditions exist.[7] The regulations and security agreement define default as including improper care or abandonment of the security.[8] Arcoren apparently interprets the phrases "on default" and "after default" in the statute as requiring FmHA to provide prior notice and a hearing in order to establish default. Nothing in the statutes, however, requires FmHA officials to establish default based on notice and a hearing. In Arcoren's affidavit and in the stipulated facts, Arcoren admits that during the winter his cattle were located on either the trust land belonging to his father and his uncle or on Richard Hand's land. D.R. at 53, 55. He also admits that his uncle and Richard Hand visited Peters' office and told him that they, not Arcoren, had been caring for the cattle and that they would turn the cattle out onto the road if FmHA did not take action. There is nothing in the statutes, regulations, or security agreement that clearly establishes that FmHA officials could not exercise their discretion to determine that Arcoren was in default under the security agreement based on this information. Thus, the provisions cited by Arcoren do not bear upon the constitutional analysis concerning what process was due.

Accordingly, we affirm the judgment of the district court.

---

**7.** One exception to the notice requirement is when the collateral was "of a type customarily sold on a recognized market." S.D. Codified Laws Ann. § 57A–9–504(3). The district court held that none of the cases Arcoren cited clearly established as of March, 1980 that cattle were *not* sold on a recognized market. The district court has since been proved correct in its determination. In *First National Bank of Minneapolis v. Kehn Ranch, Inc.*, 394 N.W.2d 709 (S.D.1986), the South Dakota Supreme Court declined to follow the cases cited by Arcoren and held that commercial cattle raised for sale at public livestock markets are " 'collateral of a type customarily sold on a recognized market' for purposes of S.D. Codified Laws Ann. 57A–9–504(3)." *Id.* at 715 (footnote omitted).

**8.** *See supra* n. 2.

LAY, Chief Judge, dissenting.

I join in Judge Heaney's excellent dissent. I write separately only to emphasize that the weakness and general inconsistency of the majority opinion is reflected in the fact that the government does not even argue, brief, or contend that the FmHA officials were not acting in their sovereign capacity.[1] This is demonstrably illustrated by the government's claim in the district court that as officials of FmHA they enjoy absolute governmental immunity under *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Although the claim of absolute immunity is not raised on appeal, the government does assert that the officials were acting in their sovereign capacity and as such enjoy good faith immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The majority so holds. But this analysis is totally inconsistent with the reasoning that the FmHA officials were not carrying out the duties of a sovereign power. There should be little question that these officials have denied the plaintiff's property rights without due process of law.

HEANEY, Circuit Judge, dissenting.

In my view, Judge Edward Dumbauld's opinion for the panel correctly stated the law and should be accepted by the Court en banc. *Arcoren v. Peters,* 811 F.2d 392 (8th Cir.1987). Accordingly, I dissent from the en banc opinion and do so for the reasons so ably set forth by Judge Dumbauld in his opinion of February 2, 1987.

I write only to emphasize several points in the panel opinion which are largely ignored by the majority:

(1) The plain language of the fifth amendment to the United States Constitution states, "No person shall * * * be deprived of * * * property, without due process of law." There is no question that, at the time Arcoren's cattle were taken by the FmHA officials, he had a property interest in the cattle protected by the fifth amendment. *See, e.g., Fuentes v. Shevin,* 407 U.S. 67, 85, 92 S.Ct. 1983, 1996–97, 32 L.Ed.2d 556 (1972) (possessory interest in chattels protected by fourteenth amendment due process); *Rau v. Cavenaugh,* 500 F.Supp. 204, 206 (D.S.D.1980) (Bogue, J.) (finding "plaintiff's interest in her FmHA financed home is a property interest protected by the fifth amendment"); *see also Johnson v. Department of Agriculture,* 734 F.2d 774, 782 (11th Cir.1984) ("An FmHA loan, once made, creates a statutory entitlement and a property interest protected by the due process clause of the Fifth Amendment.") (citing *Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970); *United States v. Henderson,* 707 F.2d 853, 857 (5th Cir. 1983); *McCachren v. Department of Agriculture,* 599 F.2d 655, 656 (5th Cir.1979); *Neighbors v. Block,* 564 F.Supp. 1075 (E.D. Ark.1983); *United States v. Ford,* 551 F.Supp. 1101 (N.D.Miss.1982); *Rau v. Cavenaugh,* 500 F.Supp. 204 (D.S.D.1980); *United States v. White,* 429 F.Supp. 1245 (N.D.Miss.1977); *Ricker v. United States,* 417 F.Supp. 133 (D.Me.1976); *Law v. Department of Agriculture,* 366 F.Supp. 1233 (N.D.Ga.1973)).

(2) It had been long established at the time the FmHA officials took Arcoren's cattle that, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present objections." *Mullane v. Central Hanover Bank,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1970); *see also Rau v. Cavenaugh,* 500 F.Supp. at 206 ("In this case the due process requirements of adequate notice and the opportunity to be heard are required by the fifth amendment.").

*Fuentes v. Shevin,* decided by the Supreme Court in 1972, states:

---

**1.** The United States in its brief asserts (1) the FmHA officials are entitled to the defense of qualified immunity as *government* officers; (2) as *government* officials they were exercising their discretionary authority; (3) the notice requirement had been waived by the plaintiff in the security agreement; and (4) that the *government* officials did not violate any "clearly established" right at the time of the violation.

For more than a century the central meaning of procedural due process has been clear: "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." It is equally fundamental that the right to be heard "must be granted at a meaningful time and in a meaningful manner."

*Fuentes v. Shevin,* 407 U.S. 67, 102 S.Ct. 1983, 32 L.Ed.2d 556, 569–70 (1972) (citations omitted).

It is difficult to understand how we can ignore this very specific language and hold that the law with respect to notice and hearing was not clearly established when Terry Arcoren's property was seized and sold without notice to him.

(4) The text of the United States Constitution could not be clearer that officials acting on behalf of the United States Government may proceed against an individual as permitted by state statute only if the proceeding is permissible under the United States Constitution. *See* United States Constitution, Article VI ("This Constitution * * * shall be the supreme law of the Land"). Self-help statutes for creditors enjoy no exemption from the Supremacy Clause. *Cf. Mennonite Board of Missions v. Adams,* 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983) (holding that due process requires notice by mail to mortgagee of property prior to foreclosure of a tax lien despite state statute that did not require such notice). Requirements imposed upon federal officials by the United States Constitution do not fall by the wayside merely because they are acting pursuant to a state statute of which private creditors may make use.

The majority recognizes that government officials, such as those acting on behalf of the FmHA, must comply with constitutional requirements whether they are performing a traditionally private function or acting pursuant to an agreement with a private individual. Yet, astonishingly, the majority would exempt the FmHA officials from requirements imposed by the Constitution because the action "was not * * * pursuant to [the FmHA's] authority as a sovereign power, but pursuant to a security agreement." Majority opinion at 675. The majority cites no authority for the novel proposition that government officials acting pursuant to private agreements are exempt from constitutional requirements. The cases cited by the majority are inapposite. *Warren v. Government Nat'l Mortgage Assoc.,* 611 F.2d 1229 (8th Cir.), *cert denied,* 449 U.S. 847, 101 S.Ct. 133, 66 L.Ed.2d 57 (1980), *Roberts v. Cameron-Brown Co.,* 556 F.2d 356 (5th Cir.1977), *Northrip v. Federal Nat'l Mortgage Assoc.,* 527 F.2d 23 (6th Cir.1975), and *Bichel Optical Laboratories, Inc. v. Marquette Nat'l Bank of Minneapolis,* 487 F.2d 906 (8th Cir.1973), deal with the issue whether the government is sufficiently involved in a foreclosure, either because it authorized and played a part in it pursuant to a state statute or because of the quasi-governmental status of the creditor, to invoke due process protections.[1] Certainly in determining whether a foreclosure involves state action it is relevant to consider whether the particular action was taken pursuant to a private agreement, such as a security agreement, or whether the action involved exercise of a power of a governmental nature.[2] But such considerations have nothing to do with this case.

**1.** The district court, in its opinion, recognized that the constitutionality of U.C.C. § 9–503 turns upon whether use of the statute by a *private creditor* involved sufficient state action to invoke constitutional protections. It states:

Although the self-help provisions of the U.C.C. have been declared unconstitutional in at least two cases, *Watson v. Branch County Bank,* 380 F.Supp. 945 (W.D.Mich.1974), *rev'd without opin.,* 516 F.2d 902 (6th Cir.1975); *Boland v. Essex County Bank & Trust Co.,* 361 F.Supp. 917 (D.Mass.1973), those were "exceptional cases." A greater number of decisions

have held *that repossession under the provisions of the U.C.C. does not entail state action. Arcoren v. Peters,* 627 F.Supp. 1513, 1517 n. 6 (D.S.D.1986) (emphasis added).

**2.** In *Roberts v. Cameron-Brown Co.,* 556 F.2d 356 (5th Cir.1977), the Fifth Circuit gave the reasons why FNMA, the predecessor of GNMA, was not a government agency:

Although regulated by the federal government in some aspects of its business, FNMA is essentially a privately-owned mortgage banker providing secondary mortgage loans. In

The FmHA officials concede that they were government officials acting on behalf of a government agency and that the law clearly established as much at the time they took Arcoren's cattle. This is not surprising, since the fact that they were government officials serves as the source of their claim to qualified immunity. It is incongruous to allow the FmHA officials to claim immunity as government officials and at the same time exempt them from constitutional requirements because their acts were sufficiently private in nature.

Indeed, if at the time they made the decision to repossess Arcoren's cattle, the FmHA officials believed the FmHA would have been treated as a private lender, the problems in this case may well have never occurred. While it is true that, section 9–503 of the U.C.C. authorizes self-help for private lenders, the provision is not risk free. This is because the provision only authorizes self-help in the event of a default, as that term is defined in the agreements of the debtor and creditor. Thus, utilization of U.C.C. § 9–503 involves a determination by the creditor whether there has been a default. The determination is not to be made lightly, however, because if the creditor decides incorrectly that a default has occurred and utilizes the self-help provisions of the U.C.C., it will be liable to the debtor for the tort of conversion. The deterrent effect of the conversion action serves to limit a private creditor's use of self-help to those instances in which it is certain a default has occurred and in which it is likely the debtor will destroy or move the security beyond the creditor's reach before it may be repossessed by judicial process. In this light, and given the facts of this case, it would have been a reckless lawyer who would have advised the FmHA officials to repossess Arcoren's cattle according to U.C.C. § 9–503 on the basis of the hearsay information available to them, if they faced the same liability as a private lender.[3]

Of course, the FmHA is *not* a private lender and does not claim to have been in 1980. In fact, the FmHA officials in this case not only claim qualified immunity, they also argued for absolute immunity in the district court, based on *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), claiming their actions involved discretionary governmental functions of an official nature. Nonetheless, the majority ignores the arguments of the parties and affords the FmHA officials a chameleon-like quality, finding their actions sufficiently governmental to merit qualified immunity and sufficiently private to be exempt from constitutional requirements.

1968, Congress specifically dissociated FNMA from its previous government ownership and transferred it to private ownership. * * * FNMA maintains the capital structure of a privately-owned corporation. HUD's control extends over restricted areas, including approving the minimum amount of FNMA stock to be held by servicing companies, requiring that a reasonable portion of its mortgage purchases be related to the national goal of providing low income housing, and auditing financial records. * * * The secretary of the treasury also has some control over FNMA relating to the issuance of debt securities and borrowing from the Treasury. * * * We stand with the Sixth Circuit position that although the regulating statutes impose certain obligations on FNMA, the federal government and FNMA have not become so interdependent as to make its actions the actions of the federal government.

*Id.* at 359 (citations omitted).

Moreover, even if *Warren v. Government Nat'l Mortgage Assoc.,* 611 F.2d 1229 (8th Cir.), *cert. denied,* 449 U.S. 847, 101 S.Ct. 133, 66 L.Ed.2d 57 (1980), had involved state action, there is nothing in the case contrary to Arcoren's position. In *Warren,* notice was given to the property owners, first by letter and then by publication. GNMA did not secure possession of the property until after it brought an action for unlawful detainer in state court and obtained a judgment in that court. In this case, there was no notice, no hearing and no judicial proceeding, and unfortunately, the federal officers who seized and immediately sold the cattle had, at least we must assume for purposes of this appeal, made no independent effort to determine whether there had in fact been a default.

3. In addition, there are criminal penalties in force for knowingly converting, concealing, removing, or disposing of any property mortgaged or pledged to the FmHA, under 18 U.S.C. § 658. It has been recognized that the availability of the criminal statute makes the self-help provisions of the U.C.C. less necessary for the FmHA to protect security interests in transportable or destructible chattel. *See, e.g., Coleman v. Block,* 580 F.Supp. 194, 204 (D.N.D.1984).

In essence, the majority's decision creates a new "hybrid" type of lender. This hybrid enjoys the privileges of both private and governmental lenders, while being exempt from the responsibilities of both. Thus, the "hybrid" may take advantage of the self-help provisions of the U.C.C. without regard to the fifth amendment, while likely enjoying absolute immunity for itself and its agents acting in an official capacity and qualified immunity for its agents in their individual capacities from any conversion action.[4]

Perhaps, in a perfect world, it would be best to allow all creditors, governmental and nongovernmental, to operate according to the provisions of the Uniform Commercial Code without regard to Constitutional requirements and subject only to the deterrent effect the tort action would provide to those thinking of using self-help. This,

however, is not the case. The government and governmental officials enjoy significant immunities whether or not the function they perform is that of a private lender. In my view, if the government and its officials are to be awarded the benefit of these immunities, they must also accept the fact that they are bound to abide by the requirements of the Constitution.

In sum, governmental officials are not exempt from the requirements of the Constitution because a state statute authorizes a private individual to utilize a course of conduct otherwise off-limits to them. The law has always been clear that the Constitution prohibits officials acting on behalf of the government from depriving an individual of property without due process. The majority's opinion fails to recognize this basic fact.[5]

---

4. For a discussion of FmHA immunities, see, e.g., *Hagemeier v. Block*, 806 F.2d 197 (8th Cir. 1986); *Poolman v. Nelson*, 802 F.2d 304 (8th Cir.1986); *Culbreath v. Block*, 799 F.2d 1248 (8th Cir.1986); *Hamre v. United States*, 799 F.2d 455 (8th Cir.1986); *DeJournett v. Block*, 799 F.2d 430 (8th Cir.1986); *United States v. Perry*, 706 F.2d 278 (8th Cir.1983); *Johnson v. Busby*, 704 F.2d 419 (8th Cir.1983).

5. Although raised by the appellee, the majority's disposition of the case obviates the need for it to consider whether Arcoren waived constitutional due process rights to notice and a hearing. As the Supreme Court has recognized, "the hearing required by due process is subject to waiver." *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185, 92 S.Ct. 775, 782, 31 L.Ed.2d 124 (1972) (citing *Boddie v. Connecticut*, 401 U.S. 371, 378–79 (1971)). Such a waiver is not, however, easily proved because a court should not "presume acquiescence in the loss of fundamental rights." *D.H. Overmyer*, 405 U.S. at 186, 92 S.Ct. at 782.

In *Rau v. Cavenaugh*, 500 F.Supp. at 207, the South Dakota district court found a covenant in an FmHA mortgage providing for waiver of notice prior to foreclosure ineffective as a waiver of the debtor's constitutional rights. In so finding the court stated, "This Court is * * * aware of the heavy burden of proof which rests upon any party that claims that a voluntary, intelligent and knowing waiver of constitutional rights has occurred." *Id.* (citing *Fuentes v. Shevin*, 407 U.S. 67, 94–95, 92 S.Ct. 1983, 2001–02, 32 L.Ed.2d 556, *rehrg. denied*, 409 U.S. 902, 93 S.Ct. 177, 34 L.Ed.2d 165 (1972); *Gonzales v. County of Hidalgo*, 489 F.2d 1043, 1046 (5th Cir.1973)).

In support of its waiver argument, the FmHA points to the fine print of the security agree-

ment it drafted. In that fine print the agreement states:

IV. IT IS FURTHER AGREED THAT:

A. Until default Debtor may retain possession of the collateral.

B. Default shall exist hereunder if Debtor fails to perform or discharge any obligation or to pay promptly any indebtedness hereby secured or to observe or perform any covenants or agreements herein or in any supplementary agreement contained, or if any of Debtor's representations or warranties herein prove false or misleading, or upon the death, bankruptcy, insolvency or incompetency of Debtor or any person so called herein. *Upon any such default:*

1. Secured party, at its option with or without notice as permitted by law, may (a) declare the unpaid balance on the note and any indebtedness secured hereby immediately due and payable, (b) enter upon the premises and take possession of, cultivate and harvest crops, repair, improve, use, and operate the collateral or make equipment unusable, for the purpose of protecting or preserving the collateral or this lien, or preparing or processing the collateral for sale, and (c) exercise any sale or other rights accorded by law.

2. Debtor hereby (a) agrees to assemble the collateral and make it available to Secured Party at such time(s) and place(s) as designated by the Secured Party, and (b) waives all notices, exemptions, compulsory disposition and redemption rights. [Emphasis added.]

According to the plain language of the security agreement, Arcoren has not waived any rights to notice and hearing. The waiver provisions of the security agreement are effective only upon default. Until default, the provisions remained inoperative. This interpretation is reinforced

(5) With regard to the time at which Arcoren was entitled to notice and an opportunity to respond, the majority mistakenly relies on South Dakota's version of U.C.C. § 9–503 to establish that Arcoren had no right to notice and hearing before the FmHA took his cattle. This reliance is misplaced. As shown above, the due process clause of the fifth amendment prohibits the government from utilizing the section. Rather, the law at the time Arcoren's cattle were taken clearly established his right to some form of notice and an opportunity to be heard before they were seized and sold.

The majority correctly recognizes that the process that is due depends on a weighing of "first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

In applying the first prong of the test, it is clear that Arcoren had a property inter-est in the cattle protected by the fifth amendment. As to the second part of the test, it is important to recognize that in the present posture of the case, we must assume that Arcoren was current on his obligations under the loan and that he was not in default. Thus, this was not a case, such as a delinquency in payment, in which default was readily ascertainable by reference to an objective event. Determining default required the FmHA officials to collect some information as to Arcoren's care of the cattle. Certainly, one of the best sources of such information, and a logical starting point, was Arcoren himself. In this light, the FmHA officials' reliance solely on third party information is questionable.

Finally, with respect to the government's interest and function, section 122 of the Agricultural Credit Act of 1978 is evidence of the intent of Congress as to the proper function of the FmHA and the interests it should serve.[6] Thus, Judge Dumbauld held in the panel opinion that section 1981a of 7 U.S.C., as subsequently interpreted by *Allison v. Block*, 723 F.2d 631 (8th Cir. 1983), to require the FmHA to give predeprivation notice of deferral relief and to require uniform procedures for deferral eligibility, should have lead the FmHA officials to conclude that a predeprivation no-

by clause A which states that Arcoren may retain possession of the cattle until default. Yet, at this stage in the proceeding Arcoren has alleged, and we must accept, that he has not defaulted in any manner. Therefore, by the terms of the security agreement, Arcoren did not waive the right to notice and a hearing prior to the taking of his cattle.

In addition, even if the security agreementg did contain language of waiver, it would be ineffective. Although the Supreme Court has allowed waiver of notice and a hearing in the context of debtor-creditor relations, it did so only upon a finding that the waiver was supported by valuable additional consideration and was the result of arms length bargaining. *See D.H. Overmyer*, 405 U.S. at 187, 92 S.Ct. at 783. In this case, as in most cases in which the FmHA is the lender, the debtor was presented with a "take it or leave it" situation. The FmHA, by definition is a lender of last resort. As such, it can dictate the terms of its contracts. Moreover, the waiver clause in this case is located on the back of the security agreement in the fine print. There is no indication that the waiv-er was bargained for in any meaningful sense, or that it was supported by any additional consideration. Given these facts, it would be inappropriate to grant the FmHA officials summary judgment on the basis that Arcoren waived his right to a notice and a hearing.

**6.** In a footnote to the panel opinion, Judge Dumbauld points out that FmHA officials must heed and adopt policies mandated by the Congress. The opinion states:

For example, the FmHA is not free to adopt the policy that something must be done to reduce the national deficit, and that therefore all farm loans shall be liquidated and foreclosed and collection thereof accelerated upon the slightest pretext, in order to gather as much money as possible into the government's hands to be applied to reduction of the national debt. On the contrary the FmHA must heed and adhere to the policy mandated by Congress of preserving existing farm operations wherever possible when they are threatened by temporary emergencies.

*Arcoren*, 811 F.2d at 398 n. 14.

tice and hearing were required in Arcoren's case. Judge Dumbauld arrived at the conclusion reasoning that if Congress had expressed its intent that those who are clearly in default are entitled to predeprivation notice and hearing, those for whom default was at issue would be entitled to no less, particularly in light of the policy embodied in the statute of "facilitating whenever practicable the continued operation of existing agricultural enterprises." *Arcoren*, 811 F.2d at 399. Thus, the law at the time Arcoren's cattle were seized and sold, was clearly established with respect to notice and hearing, and its requirements were not overly burdensome or surprising. It merely required the FmHA officials to contact Arcoren and to give him a chance to respond before seizing and selling his cattle.[7] *Cf.* K. Davis, Administrative Law Treatise § 13:2 p. 477 (1979 & Supp.1982) ("A mighty good procedure—far superior to complete absence of procedural protection—is to confront a party with a summary of the evidence against him and to listen for five minutes to what he has to say.")

In sum, it is unconscionable that the FmHA officials involved seized and immediately sold Arcoren's cattle without providing him notice, without providing him an opportunity to respond to accusations by third parties that he had abandoned the cattle, without engaging in any judicial proceeding, and without even making any effort to independently verify whether Arcoren had in fact abandoned his cattle. The alleged behavior, if true, violated Arcoren's clearly established constitutional rights. The panel opinion is sound and should be adhered to.

---

**7.** The majority's statement, "that there would be little reason to require a pre-foreclosure hearing because as a practical matter a mortgagee would have no reason to institute foreclosure proceedings unless the mortgagor had defaulted," majority opinion at 8, fails completely to consider the purpose served by a hearing. The purpose of the hearing is to allow the debtor to correct any misinformation the creditor may have concerning default. Moreover, since foreclosure and sale of collateral is a costly procedure and often fails to yield funds sufficient to fully pay the debt, it will normally be in the creditor's interest to contact the debtor and avoid foreclosure if at all possible.